**WATANABE ING LLP**
MELVYN M. MIYAGI          #1624-0
  mmiyagi@wik.com
ROSS T. SHINYAMA         #8830-0
  rshinyama@wik.com
SUMMER H. KAIAWE        #9599-0
  skaiawe@wik.com
First Hawaiian Center
999 Bishop Street, Suite 1250
Honolulu, Hawaiʻi  96813
Telephone:  (808) 544-8300
Facsimile:  (808) 544-8399

**SUSMAN GODFREY LLP**
ERICA W. HARRIS (*Pro Hac Vice forthcoming*)
  eharris@susmangodfrey.com
1000 Louisiana, Suite 5100
Houston, Texas  77002-5096
Telephone:  (713) 653-7810
Facsimile:  (713) 654-6666

**GIBSON, DUNN & CRUTCHER LLP**
THEODORE J. BOUTROUS, JR. (*Pro Hac Vice forthcoming*)
  tboutrous@gibsondunn.com
TIAUNIA N. HENRY (*Pro Hac Vice forthcoming*)
  thenry@gibsondunn.com
333 South Grand Avenue
Los Angeles, California 90071
Telephone: (213) 229-7000
Facsimile: (213) 229-7520

JOSHUA D. DICK (*Pro Hac Vice forthcoming*)
  JDick@gibsondunn.com
One Embarcadero Center
Suite 2600
San Francisco, California 94111
Telephone: (415) 393-8321
Facsimile: (415) 374-8451

ANDREA E. SMITH (*Pro Hac Vice forthcoming*)
  AESmith@gibsondunn.com
200 Park Avenue
New York, New York 10166
Telephone: (212) 351-3883
Facsimile: (212) 351-5303

PETER E. SELEY (*Pro Hac Vice forthcoming*)
  pseley@gibsondunn.com
MICHAEL K. MURPHY (*Pro Hac Vice forthcoming*)
  mmurphy@gibsondunn.com
1700 M Street, N.W.
Washington, DC 20036
Telephone: (202) 955-8500

Attorneys for Defendants
**CHEVRON CORPORATION and CHEVRON U.S.A. INC.**

Electronically Filed
FIRST CIRCUIT
1CCV-25-0000717
17-JUN-2025
02:01 PM
Dkt. 24 MOT

# APPENDIX B

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| STATE OF HAWAIʻI, ex rel. ANNE E. LOPEZ, ATTORNEY GENERAL,<br><br>                                    Plaintiff,<br><br>v.<br><br>BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORP.; CHEVRON U.S.A. INC.; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; SHELL P.L.C.; SHELL USA, INC.; EQUILON ENTERPRISES LLC d/b/a SHELL OIL PRODUCTS US; SHELL TRADING (US) COMPANY; SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66; PHILLIPS 66 COMPANY; WOODSIDE ENERGY HAWAII INC. f/k/a BHP HAWAII INC.; AMERICAN PETROLEUM INSTITUTE; and DOES 1 through 100, inclusive,<br><br>                                    Defendants. | CIVIL NO. 1CCV-25-0000717 (JJK) (Other Non-Vehicle Tort)<br><br>**DEFENDANTS' MOTION TO STAY PROCEEDINGS; MEMORANDUM IN SUPPORT OF MOTION; EXHIBIT "1"; NOTICE OF HEARING MOTION; AND CERTIFICATE OF SERVICE**<br><br><br><br>**HEARING:**<br>Date:  July 30, 2025<br>Time:  9:30 a.m.<br>Judge: Honorable Jordon J. Kimura<br>Trial Date: None |

## **DEFENDANTS' MOTION TO STAY PROCEEDINGS**

Defendants respectfully move for an order staying proceedings in this case pending resolution of the first-filed lawsuit commenced by the United States against the State of Hawaiʻi in the United States District Court for the District of Hawaii.  In that lawsuit, the United States seeks to enjoin this action, and resolution of the federal case may dispose of this case entirely.  *See United States v. State of Hawaiʻi*, No. 1:25-cv-00179 (D. Haw. Apr. 30, 2025).

This Motion is brought under Rule 7 of the Hawaiʻi Rules of Civil Procedure and Rules 3, 7, and 7.1 of the Rules of the Circuit Courts of the State of Hawaiʻi, and is supported by the

attached Memorandum in Support of Motion, the entire record and files in this case, and evidence or arguments as may be presented at the hearing of this Motion.

DATED: Honolulu, Hawaiʻi, June 17, 2025.

/s/ Melvyn M. Miyagi
**WATANABE ING LLP**
Melvyn M. Miyagi
Ross T. Shinyama
Summer H. Kaiawe

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (*Pro Hac Vice forthcoming*)
Andrea E. Smith (*Pro Hac Vice forthcoming*)
Joshua D. Dick (*Pro Hac Vice forthcoming*)
Peter E. Seley (*Pro Hac Vice forthcoming*)
Michael K. Murphy (*Pro Hac Vice forthcoming*)
Tiaunia N. Henry (*Pro Hac Vice forthcoming*)

**SUSMAN GODFREY LLP**
Erica W. Harris (*Pro Hac Vice forthcoming*)

*Attorneys for Defendants Chevron Corporation and Chevron U.S.A. Inc.*

/s/ William G. Meyer, III
William G. Meyer, III
Ian P. Luthringer
**SETTLE MEYER LAW, LLC**

*Attorneys for Defendants CONOCOPHILLIPS and CONOCOPHILLIPS COMPANY*

/s/ Lisa A. Bail
Lisa A. Bail
David J. Hoftiezer
**GOODSILL ANDERSON QUINN & STIFEL LLP**

*Attorneys for Defendants BP America Inc. and BP Products North America Inc.*

3

/s/ Gregory W. Kugle
**DAMON KEY LEONG KUPCHAK HASTERT**
Gregory W. Kugle
Ross Uehara-Tilton
David H. Abitbol
Kira-Nariese K. Brown

*Attorneys for Defendants*
*PHILLIPS 66 and PHILLIPS 66 COMPANY*

/s/ Joachim Cox
**COX FRICKE LLP**
800 Bethel St #600
Honolulu, HI 96813
Telephone: (808) 585-9441
Email: jcox@cfhawaii.com

*Counsel for Defendants*
*SHELL PLC (F/K/A ROYAL DUTCH SHELL PLC) and*
*SHELL USA, INC. (F/K/A SHELL OIL COMPANY)*

/s/ Margery S. Bronster
**BRONSTER FUJICHAKU ROBBINS**
Margery S. Bronster
Lanson K. Kupau
Kelly A. Higa Brown

*Attorneys for Defendant WOODSIDE ENERGY HAWAII*
*INC. (f/k/a BHP HAWAII INC.)*

/s/ C. Michael Heihre
C. Michael Heihre
Michi Momose
**CADES SCHUTTE**
A Limited Liability Law Partnership

*Attorneys for Defendants ALOHA PETROLEUM, LTD. and*
*ALOHA PETROLEUM LLC*

4

*By: /s/ Paul Alston*
Paul Alston
Claire Wong Black
Glenn T. Melchinger
John-Anderson L. Meyer
**DENTONS US LLP**

*Attorneys for Defendants Exxon Mobil Corporation and ExxonMobil Oil Corporation*

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAIʻI

| | |
|---|---|
| STATE OF HAWAIʻI, ex rel. ANNE E. LOPEZ, ATTORNEY GENERAL,<br><br>                                        Plaintiff,<br><br>v.<br><br>BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORP.; CHEVRON U.S.A. INC.; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; SHELL P.L.C.; SHELL USA, INC.; EQUILON ENTERPRISES LLC d/b/a SHELL OIL PRODUCTS US; SHELL TRADING (US) COMPANY; SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66; PHILLIPS 66 COMPANY; WOODSIDE ENERGY HAWAII INC. f/k/a BHP HAWAII INC.; AMERICAN PETROLEUM INSTITUTE; and DOES 1 through 100, inclusive,<br><br>                                        Defendants. | **CIVIL NO. 1CCV-25-0000717 (JJK) (Other Non-Vehicle Tort)**<br><br>**MEMORANDUM IN SUPPORT OF MOTION** |

## INTRODUCTION

On May 1, 2025, the State of Hawaiʻi filed this lawsuit against defendant energy companies and a trade association seeking to impose substantial damages under state law for alleged contributions to global climate change. *See* Dkt. 1. But at the time the State filed this suit, the United States had already filed a pending action against the State in the United States District Court for the District of Hawaii, seeking to enjoin precisely the sorts of claims the State has now brought in this Court. *See United States v. State of Hawaiʻi*, No. 1:25-cv-00179 (D. Haw. Apr. 30, 2025) (the "Federal Action"). Resolution of the Federal Action may ***fully dispose of the lawsuit before this Court*** and make it clear that the state law claims advanced here are preempted and precluded

by the United States Constitution and federal law. Even if the Federal Action does not fully dispose of the entirety of this suit, proceedings in the Federal Action may materially impact key issues in this case by, for example, limiting the scope of the State's claims or illuminating key issues of federal law.

This Court should stay proceedings in this case until after the federal courts have resolved the first-filed Federal Action and determined whether the State may bring the claims advanced in this suit. As the United States explains in the Federal Action, the State's claims, *inter alia*, are precluded and "preempted by the Clean Air Act," "violate the Constitution's structure and principles of due process," "undermine federal objectives by increasing energy costs and disrupting the national energy market," and "impose a substantial and undue burden on interstate commerce." Compl., *United States v. State of Hawaiʻi*, No. 1:25-cv-00179, Dkt. 1 ¶¶ 39, 41, 50, 63 (D. Haw. Apr. 30, 2025) ("Fed. Compl.," attached as Ex. 1). The Federal Action contends that a suit like the State's violates the federal Constitution and federal law in five different, and independent, ways—and if the federal courts agree with the United States on *any one* of these five grounds, the State's suit will be foreclosed and there will be nothing more for this Court to adjudicate. A stay would therefore promote judicial efficiency and conserve party and judicial resources. Staying this litigation also avoids the federalism, comity, and practical problems that would result from conflicting decisions on the same issues in both cases. And although proceeding with this suit before the resolution of the Federal Action would subject Defendants to meaningful harms, a stay will not prejudice the State, which would reap the same efficiency benefits as Defendants and this Court. Conversely, proceeding with this litigation prior to the resolution of the Federal Action would require the parties, and the Court, to expend resources on needless

litigation that could be rendered moot should the federal courts ultimately endorse the position of the United States in the Federal Action.

Numerous courts have recognized the wisdom of staying a later-filed state-court action in favor of a first-filed federal action covering the same subjects. "[I]t is black letter law that, when a federal action has been filed covering the same subject matter as is involved in a [state] action, the [state] court" may "stay the state court action." *Benitez v. Williams*, 219 Cal. App. 4th 270, 276 (2013) (quoting *Caiafa Prof. Law Corp. v. State Farm Fire & Cas. Co.*, 15 Cal. App. 4th 800, 804 (1993)). Indeed, "[t]he stay of state court proceedings pending a decision in an action filed in the federal court sitting in the same state is frequently granted where the action in federal court has been commenced prior to the state court proceeding, and the decision in the federal case will be determinative of all or some of the issues in the state court action." *Henry v. Stewart*, 203 Kan. 289, 294 (1969). Granting a stay would allow the federal courts in the first-filed Federal Action to resolve crucial threshold questions that could dispose of the State's suit in this Court.

Accordingly, Defendants respectfully request that this Court stay proceedings pending the resolution of the Federal Action, filed first by the United States government, in the federal courts.[1]

## BACKGROUND

Since 2017, dozens of States and local governments across the country have filed suit against energy companies like Defendants, seeking damages under state law for the alleged effects of global climate change. Several state and federal courts have dismissed these suits, holding that the federal Constitution and federal law does not permit state law to remedy harms caused by out-

---

[1] Defendants are filing this Motion without submitting to the jurisdiction of this Court and without waiver of any defense, affirmative defense, or objection, including personal jurisdiction. Defendants expressly reserve the right to file Rule 12(b)(2) motions to dismiss for lack of personal jurisdiction consistent with the parties' stipulation, Dkt. 11, and state that no arguments made in connection with this Motion constitute consent to the jurisdiction of this Court.

of-state and worldwide emissions.  As one such state court recently explained, its decision to dismiss a very similar climate-change case on the pleadings joined "a growing chorus of state and federal courts across the United States, singing from the same hymnal, in concluding that the claims raised by [the plaintiff] are not judiciable by any state court" and are barred by our federal structure and federal law.  *Bucks Cnty. v. BP P.L.C.*, No. 2024-01836, slip op. at 11 (Pa. Ct. Com. Pl. May 16, 2025)*; see, e.g.*, *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021); *City of Oakland v. BP P.L.C.*, 325 F. Supp. 3d 1017 (N.D. Cal. 2018), *vacated on other grounds*, 960 F.3d 570 (9th Cir. 2020); *Mayor and City Council of Baltimore v. BP P.L.C.*, 2024 WL 3678699 (Md. Cir. Ct. July 10, 2024); *State ex rel. Jennings v. BP Am. Inc.*, 2024 WL 98888 (Del. Super. Ct. Jan. 9, 2024); *City of Annapolis v. BP PLC*, 2025 WL 588595 (Md. Cir. Ct. Jan. 23, 2025); *Platkin v. Exxon Mobil Corp.*, 2025 WL 604846 (N.J. Super. Ct. Feb. 5, 2025).[2]

On April 30, 2025, the United States filed the Federal Action in the United States District Court for the District of Hawaii, naming the State, the Governor, and the Attorney General as defendants.  While the State had not yet filed its lawsuit, the federal Complaint noted that the State had "announced its intent to file litigation seeking to hold fossil fuel companies liable for purported contributions to greenhouse gas emissions."  Fed. Compl. ¶ 14.  But, as the United States explained, "[t]his Nation's Constitution and laws do not tolerate" such a suit.  *Id.* ¶ 4.  To the contrary, the State's claims are "preempted by the Clean Air Act . . . because they impermissibly regulate out-of-state greenhouse gas emissions and obstruct[] the Clean Air Act's comprehensive

---

[2] In Hawaiʻi, the City and County of Honolulu sued many of the same defendants in March 2020, and the Hawaiʻi Supreme Court has permitted that suit to proceed past the pleading stage.  *See City & Cnty. of Honolulu v. Sunoco LP*, 153 Haw. 326, 537 P.3d 1173 (2023).  However, the Hawaiʻi Supreme Court did not address many of the legal arguments raised by the United States in the Federal Action.  *See* Fed. Compl. ¶¶ 42–88; *Honolulu*, 153 Haw. at 348–55, 537 P.3d at 1195–1202.

federal-state framework." *Id.* ¶ 31. Moreover, "Hawaii's state law claims violate the Constitution's structure and principles of due process by seeking to impose economic sanctions on fossil fuel businesses for economic activities that occurred primarily in other States and around the world." *Id.* ¶ 50. "If Hawaii is permitted to pursue these sorts of state law claims," the United States averred, "other States could pursue similar claims, leading to a chaotic 'patchwork' of regulations that undermine the national interest in readily available and affordable energy and the government's ability to effectively administer coherent national environmental policy and regulation of global pollution." *Id.* ¶ 40. Thus, Hawaiʻi's state law claims are precluded and preempted by the federal Clean Air Act, and run afoul of the Constitution's Due Process Clause, Interstate Commerce Clause, Foreign Commerce Clause, and assignment of the foreign affairs power to the federal government. *Id.* ¶¶ 28–88. The Federal Action seeks a declaration that Hawaiʻi's state law claims are unconstitutional, and an injunction against the named defendants "from taking actions to assert Hawaii's state law claims." *Id.* at 31 (Prayer for Relief).

The State thereafter filed exactly the state law claims that the United States seeks to enjoin. The State's suit alleges state law claims for negligence, public nuisance, private nuisance, trespass, harm to public trust resources, civil aiding and abetting, strict liability failure to warn, and violations of Hawaiʻi's unfair or deceptive acts or practices statute against nineteen energy companies and one energy trade association. *See* Compl. ¶¶ 327–448. All of the State's claims are fundamentally and unavoidably premised on the alleged effects of greenhouse gas emissions, which have allegedly contributed to global climate change and, thus, the State's claimed injuries. Specifically, the Complaint alleges a "climate deception campaign" by Defendants that has "inflat[ed] and sustain[ed] the market for fossil fuels, which drove up [greenhouse gas] emissions, accelerated global warming, and brought about devastating climate change impacts to Hawaiʻi."

*Id.* ¶ 2.  According to the Complaint, "[f]ossil fuel emissions—especially CO$_2$—are the dominant driver of climate change," and Defendants' alleged actions have contributed to increased greenhouse gas emissions around the world.  *Id.* ¶ 6; *see also id.* ¶¶ 48–58, 270.  The State seeks compensatory, punitive, natural resource, and other damages, as well as "abatement" via "an equitable fund to pay for adaptation, mitigation, and resilience measures in the State" to address the alleged impacts in Hawaiʻi caused by increases in global emissions that have contributed to global climate change.  *Id.* at 193 (Prayer for Relief).  Such requested relief, seeking to "extract large sums of money from fossil fuel companies for purportedly causing climate change impacts to Hawaii," Fed. Compl. ¶ 14, is precisely what the Federal Action contends contravenes the U.S. Constitution and federal law.

## ARGUMENT

This Court should exercise its inherent discretion to stay proceedings until the federal court resolves the first-filed Federal Action and determines whether this action should be enjoined, or at the very least limited in scope.  "The power to stay proceedings is incidental to the power inherent in every court to control the disposition of the causes on its docket with economy of time and effort for itself, for counsel, and for litigants." *City of Honolulu v. Ing*, 100 Haw. 182, 194 n.16, 58 P.3d 1229, 1240 n.16 (2002) (quoting *Air Line Pilots Ass'n v. Miller*, 523 U.S. 866, 880 (1998)).  In particular, "[a] stay may be appropriate where proceeding with the litigation will result in unnecessary duplication of effort, such as where the issues to be decided are inextricably intertwined with or affected by the resolution of other pending matters." *Blake v. County of Kauaʻi Planning Comm'n*, 131 Haw. 123, 138, 315 P.3d 749, 764 (2013) (citation omitted).  Here, judicial efficiency counsels in favor of staying this suit, which would avoid needless and duplicative

litigation as well as potentially conflicting rulings, until the key threshold issues raised in the Federal Action are resolved.

A.     **A Stay Will Promote Judicial Efficiency and Conserve Judicial Resources Pending the Determination of Dispositive Threshold Issues in the Federal Action That May Completely Resolve This Action.**

The Federal Action filed by the United States directly raises the fundamental and threshold question whether the State may advance the state law claims that it pursues in this suit, or whether those claims are precluded and preempted by federal law and the federal constitutional structure. As discussed above, the State's Complaint seeks to impose damages on Defendants for their alleged contributions to global greenhouse gas emissions and the effects of global climate change. But the United States contends that such "litigation seeking to hold fossil fuel companies liable for purported contributions to greenhouse gas emissions" is "preempted by the Clean Air Act" and "violate[s] the Constitution's structure and principles." Fed. Compl. ¶¶ 14, 41, 50.

In the Federal Action, the United States contends that the State's claims are foreclosed by the federal Constitution and federal law on no fewer than five separate grounds. If the federal courts agree with the United States on any one of these grounds, the State's action here cannot proceed.

As an initial matter, the Federal Action asserts that the State's claims are preempted by the federal Clean Air Act, "because they impermissibly regulate out-of-state greenhouse gas emissions and obstruct[] the Clean Air Act's comprehensive federal-state framework and EPA's regulatory discretion." Fed. Compl. ¶ 31. The Federal Action contends that the State's claims "conflict with the Clean Air Act's purposes and objectives by undermining its carefully calibrated cooperative federalism scheme and EPA's discretion in regulating greenhouse gas emissions," and "obstruct[] EPA's discretion to balance environmental, economic, and energy considerations in regulating

greenhouse gases." *Id.* ¶¶ 35, 38. "Hawaii's state law claims would further undermine federal objectives by increasing energy costs and disrupting the national energy market, contrary to the Clean Air Act's integration with national energy policy." *Id.* ¶ 39. And they would lead to "a chaotic 'patchwork' of regulations that undermine the national interest in readily available and affordable energy and the government's ability to effectively administer coherent national environmental policy and regulation of global pollution." *Id.* ¶ 40.

The United States also contends that the State's claims violate the Constitution in four separate and independent ways. *First*, "[t]he Constitution's structure and provisions, including the Due Process Clause, as well as concepts of State sovereignty and federalism, prohibit a State from regulating transactions, and imposing liability for conduct, occurring outside its borders." Fed. Compl. ¶ 43. The United States explains that "Hawaii's state law claims violate the Constitution by imposing extraterritorial liability for primarily out-of-state extraction and refining activities and out-of-state greenhouse gas emissions." *Id.* They "improperly seek to 'impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them),' including activities in other States and in foreign countries with no connection to Hawaii." *Id.* ¶ 51 (quoting *City of New York*, 993 F.3d at 93). The United States argues that, "the global scope of Hawaii's state law claims inherently overreaches by seeking to regulate conduct far beyond Hawaii's territorial jurisdiction, contravening the Due Process Clause's territorial limitations on state sovereignty." Fed. Compl. ¶ 53. At bottom, such claims "violate the Constitution's structure and principles of due process by seeking to impose economic sanctions on fossil fuel businesses for economic activities that occurred primarily in other States and around the world." *Id.* ¶ 50.

*Second*, the State's claims violate the Interstate Commerce Clause, because they "discriminate against interstate commerce facially, in practical effect, and in purpose by targeting commercial activity—fossil fuel extraction and refining—that occurs primarily if not exclusively in States other than Hawaii." Fed. Compl. ¶ 58. *Third*, they violate the Foreign Commerce Clause, because they "discriminate against foreign commerce facially, in practical effect, and in purpose by imposing penalties or fines that directly and substantially burden foreign commerce," "impose[] a disproportionate burden on foreign commerce," and "undermine the federal government's ability to maintain uniformity in regulating environmental, trade, and national security policy." *Id.* ¶¶ 70, 71. And *fourth*, the State's claims are precluded and preempted by "the provisions of the Constitution that vest authority over foreign affairs in the President," because they "undermine the ability of the United States to speak with one voice on a matter of pressing interest around the globe" and "interfere[] with the United States' foreign policy on greenhouse gas regulation." *Id.* ¶¶ 81, 84, 85.

Resolution of the Federal Action by the federal courts thus has the potential to wholly dispose of this suit by holding that the State's claims are barred by the U.S. Constitution and federal law. If the federal court presiding over the Federal Action grants the relief the federal government is seeking, then the State—as the Defendant in the Federal Action, and the Plaintiff here—would be "permanently enjoin[ed]" from proceeding with its litigation in this Court. Fed. Compl. at 31 (Prayer for Relief). Simply put, if the United States prevails in the Federal Action, then this suit will be over.

Under the circumstances, it is appropriate to stay this action to permit the first-filed Federal Action to proceed and resolve these foundational issues it raises. Continuing with this litigation in parallel with the Federal Action would require substantial attention and resources from the

9

parties and this Court, including to resolve threshold motions to dismiss and, if such motions are not successful, to manage what could be expansive and contentious discovery.  This is precisely the sort of "unnecessary duplication of effort" in litigation "inextricably intertwined with [and] affected by the resolution" of the Federal Action that the Hawaiʻi Supreme Court identified as justifying a stay in *Blake*.  131 Haw. at 138, 315 P.3d at 764.  There is no need to engage in costly and potentially superfluous litigation and waste of judicial resources when resolution of the Federal Action could well moot this entire litigation.  A stay would thus promote judicial efficiency and conserve party and judicial resources pending the resolution of the Federal Action.

A stay also would avoid the "rat's nest of comity and federalism issues," *Northrop Grumman Tech. Servs., Inc. v. DynCorp Int'l LLC*, 2016 WL 3346349, at *4 (E.D. Va. June 16, 2016), that would be presented if parallel litigation of this action and the Federal Action were to result in conflicting rulings.

"The stay of state court proceedings pending a decision in an action filed in the federal court sitting in the same state is frequently granted where the action in federal court has been commenced prior to the state court proceeding, and the decision in the federal case will be determinative of all or some of the issues in the state court action."  *Henry*, 203 Kan. at 294.  This is precisely the situation here:  The Federal Action was filed before this case and will determine whether this case may proceed at all.  Other courts have recognized the importance of staying proceedings in similar situations.  In California, for example, "[i]t is black letter law that, when a Federal action has been filed covering the same subject matter as is involved in a California action, the California court has the discretion . . . to stay the state court action."  *Caiafa Prof. Law Corp.*, 15 Cal. App. 4th at 804 (collecting cases).  Case law in other jurisdictions is in accord.  *See, e.g.*, *In re Helix Energy Solutions Grp., Inc.*, 440 S.W.3d 167, 173 (Tex. App. 2013) ("[U]nder the

doctrine of comity," "[w]hen a matter is first filed in federal court, the general rule is that Texas state courts stay the later-filed proceeding pending adjudication of the first suit."); *Vill. of Mapleton v. Cathy's Tap, Inc.*, 313 Ill. App. 3d 264, 268 (2000) ("In this case, comity is served by issuing a stay in that our state court system will be granting deference to the federal court's expertise in interpreting the constitution," and because "the chance of conflicting judgments will be removed."). As discussed in those cases, comity is served by issuing a stay here, and a stay would promote judicial efficiency, conserve party and judicial resources, avoid the possibility of conflicting rulings, and allow for the orderly resolution of key threshold issues in the first-filed Federal Action. "'Unseemly conflict' will have been avoided and the interest in judicial economy well served." *Caiafa Prof. Law Corp.*, 15 Cal. App. 4th at 807.

**B.      A Stay Will Not Prejudice Plaintiff.**

As other state courts have correctly recognized in similar climate change-related cases, a modest stay of proceedings will not prejudice the State, whereas pushing forward at this time risks substantially harming Defendants. As one court found in granting a stay in similar circumstances, "a relatively short pause of this likely lengthy litigation will not substantially harm Plaintiff's ability to prosecute its case." *Delaware v. BP Am. Inc.*, 2022 WL 605822, at *3 (D. Del. Feb. 8, 2022). Indeed, "the outcome of this lawsuit cannot turn back the clock on the atmospheric and ecological processes that defendants' activities have allegedly helped set in motion. The urgency of the threat of climate change writ large is distinct from plaintiff's interest in a speedy determination of federal jurisdiction in this suit." *City of Annapolis v. BP P.L.C.*, 2021 WL 2000469, at *4 (D. Md. May 19, 2021) (granting similar stay in climate change litigation). And the State can hardly complain about any delay considering these types of climate-change cases have been filed against the energy industry (including many of the same Defendants here) *since*

*2017.*  The State of Hawaiʻi's lawsuit comes after courts across the country have rejected similar claims.  Notably, the City and County of Honolulu filed its suit in March 2020—yet the State waited *more than five years* to file this action.

Requiring the parties to proceed would impose substantial burdens on the parties and the Court alike.  Meanwhile, waiting a short time for guidance from the federal courts on these crucial issues cannot and will not prejudice Plaintiff, who will, on the contrary, reap the same efficiency benefits as Defendants and the Court.  The public interest is best served "by avoiding the possibility of unnecessary or duplicative litigation and concentrating resources on litigating … in the proper forum."  *Delaware*, 2022 WL 605822, at *3.  As the District of Delaware found in granting a similar stay in a similar case:  "A stay . . . will not substantially harm Plaintiff and will serve the public interest."  *Id.*  The same is true here.

## CONCLUSION

This Court should exercise its inherent discretion to stay further proceedings in this case pending the resolution of the Federal Action.

DATED: Honolulu, Hawaiʻi, June 17, 2025.

*/s/ Melvyn M. Miyagi*

**WATANABE ING LLP**
Melvyn M. Miyagi
Ross T. Shinyama
Summer H. Kaiawe

**GIBSON, DUNN & CRUTCHER LLP**
Theodore J. Boutrous, Jr. (*Pro Hac Vice forthcoming*)
Andrea E. Smith (*Pro Hac Vice forthcoming*)
Joshua D. Dick (*Pro Hac Vice forthcoming*)
Peter E. Seley (*Pro Hac Vice forthcoming*)
Michael K. Murphy (*Pro Hac Vice forthcoming*)
Tiaunia N. Henry (*Pro Hac Vice forthcoming*)

**SUSMAN GODFREY LLP**
Erica W. Harris (*Pro Hac Vice forthcoming*)

*Attorneys for Defendants Chevron Corporation and Chevron U.S.A. Inc.*

*/s/ William G. Meyer, III*
William G. Meyer, III
Ian P. Luthringer
**SETTLE MEYER LAW, LLC**

*Attorneys for Defendants*
*CONOCOPHILLIPS* and *CONOCOPHILLIPS COMPANY*
*/s/ Lisa A. Bail*
Lisa A. Bail
David J. Hoftiezer
**GOODSILL ANDERSON QUINN & STIFEL LLP**

*Attorneys for Defendants BP America Inc. and BP Products North America Inc.*

*/s/ Gregory W. Kugle*
**DAMON KEY LEONG KUPCHAK HASTERT**
Gregory W. Kugle
Ross Uehara-Tilton
David H. Abitbol
Kira-Nariese K. Brown

*Attorneys for Defendants*
*PHILLIPS 66 and PHILLIPS 66 COMPANY*

*/s/ Joachim Cox*
**COX FRICKE LLP**
800 Bethel St #600
Honolulu, HI 96813
Telephone: (808) 585-9441
Email: jcox@cfhawaii.com

*Counsel for Defendants*
*SHELL PLC (F/K/A ROYAL DUTCH SHELL PLC) and SHELL USA, INC. (F/K/A SHELL OIL COMPANY)*

*/s/ Margery S. Bronster*
**BRONSTER FUJICHAKU ROBBINS**
Margery S. Bronster
Lanson K. Kupau
Kelly A. Higa Brown

13

*Attorneys for Defendant WOODSIDE ENERGY HAWAII INC.
(f/k/a BHP HAWAII INC.)*

/s/ C. Michael Heihre
C. Michael Heihre
Michi Momose
**CADES SCHUTTE**
A Limited Liability Law Partnership

*Attorneys for Defendants ALOHA PETROLEUM, LTD. and
ALOHA PETROLEUM LLC*

By: /s/ Paul Alston
Paul Alston
Claire Wong Black
Glenn T. Melchinger
John-Anderson L. Meyer
**DENTONS US LLP**

*Attorneys for Defendants Exxon Mobil Corporation and
ExxonMobil Oil Corporation*

14

# Exhibit "1"

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General
ROBERT N. STANDER
Deputy Assistant Attorney General
JUSTIN D. HEMINGER
Attorney
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
Telephone: (202) 514-2689
Facsimile: (202) 305-0506
Email: justin.heminger@usdoj.gov

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

_____

UNITED STATES OF AMERICA,  )
                            )
          *Plaintiff,*       )
                            )
     v.                     )
                            )  No. 1:25-cv-00179
STATE OF HAWAII; JOSHUA BOOTH  )
GREEN, Governor of Hawaii, in his  )
official capacity; and ANNE E. LOPEZ, in her  )
official capacity as Hawaii Attorney General,  )
                            )
          *Defendants.*      )
_____)

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

Exhibit "1"

Plaintiff United States of America bring this civil action against Defendants and alleges as follows:

## **INTRODUCTION**

1.     The United States is facing an energy crisis. Overly restrictive policies and regulation have caused inadequate development of America's abundant energy resources. Yet "[a]n affordable and reliable domestic energy supply is essential to the national and economic security of the United States, as well as our foreign policy." Executive Order 14260, *Protecting American Energy From State Overreach* § 1.

2.     As a result, on January 20, 2025, President Trump declared an energy emergency, concluding that the United States' "insufficient energy production, transportation, refining, and generation constitutes an unusual and extraordinary threat to our Nation's economy, national security, and foreign policy." Executive Order 14156, *Declaring a National Energy Emergency* § 1.

3.     As a result of state restrictions and burdens on energy production, the American people are paying more for energy, and the United States is less able to defend itself from hostile foreign actors. *Id.*

4.     Hawaii intends to sue fossil fuel companies to seek damages for alleged climate change harms. *See* Sam Spangler, Hawaii To File Lawsuit Against Fossil Fuel Companies, Khon2 (Apr. 28, 2025), https://www.khon.com/local-

2

news/hawaii-to-file-lawsuit-against-fossil-fuel-companies/ ("'We will be filing

suit, I believe, on Thursday against the fossil fuel companies. They have to pay

their share because climate change and the climate impact is definitely connected

to generations of extra fossil fuel that's been burned.'"). At a time when States

should be contributing to a national effort to secure reliable sources of domestic

energy, Hawaii is choosing to stand in the way. This Nation's Constitution and

laws do not tolerate this interference.

## JURISDICTION AND VENUE

5.      This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1345.

6.      This Court has authority to provide the relief requested under the U.S.

Constitution, 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent legal and

equitable powers.

7.      The United States has standing to vindicate its sovereign, proprietary,

and parens patriae interests. *E.g.*, *Arizona v. United States*, 567 U.S. 387 (2012).

The United States' sovereign interests include ensuring that States do not interfere

with federal law, including the Clean Air Act, or with the federal government's

exclusive authority over interstate and foreign commerce, greenhouse gas

regulation, and national energy policy. The United States' proprietary interests

include its economic interests in revenue from fossil fuel leasing on federal lands,

which generated over $13.8 billion in 2024,[1] and its costs for purchasing fossil fuels, which will increase if Hawaii and other states seek damages from fossil fuel companies. *See City of New York v. Chevron Corp.*, 993 F.3d 81, 103 (2d Cir. 2021) (observing that holding fossil fuel producers "accountable for purely foreign activity (especially the Foreign Producers) would require them to internalize the costs of climate change and would presumably affect the price and production of fossil fuels abroad."). Additionally, the United States has parens patriae standing to protect the economic well-being of its citizens and the national energy market from Hawaii's attempts to impose extraterritorial and excessive burdens on fossil fuel companies, which will raise energy costs for consumers nationwide and disrupt the uniform regulation of fossil fuel production. These harms affect a substantial segment of the population, and individual litigants, such as fossil fuel businesses, cannot fully address the nationwide economic and constitutional injuries caused by Hawaii's overreach.

---

[1] The Department of the Interior manages land owned by the United States. The Department issues leases to produce fossil fuels from federal lands and for production in areas of the Outer Continental Shelf. Each year, the Department collects substantial revenue from those onshore and offshore leases. In 2024, the Department collected revenue of more than $490 million for coal, $950 million for gas, and $12.4 billion for oil. *See* U.S. DEP'T OF THE INTERIOR, NATURAL RESOURCES REVENUE DATA, https://revenuedata.doi.gov/ (last visited Apr. 30, 2025).

8. This Court has personal jurisdiction over Defendants because they reside in, or conduct a substantial portion of their official business in, Hawaii. *See* Fed. R. Civ. P. 4(k)(1).

9. Venue is proper in the District of Hawaii pursuant to 28 U.S.C. § 1391, because at least one Defendant resides in the District and because a substantial part of the acts giving rise to this suit occurred within the District.

## PARTIES

10. Plaintiff is the United States of America, suing on its own behalf, on behalf of its citizens, and on behalf of its executive departments and other subdivisions.

11. Defendant State of Hawaii is a State of the United States.

12. Defendant Joshua Booth Green is the Governor of the State of Hawaii. He is sued in his official capacity.

13. Defendant Anne E. Lopez is the Attorney General of the State of Hawaii. She is sued in her official capacity.

## ALLEGATIONS AND APPLICABLE LAW

### Hawaii's Climate Change Claims

14. Hawaii has announced its intent to file litigation seeking to hold fossil fuel companies liable for purported contributions to greenhouse gas emissions. *See* Sam Spangler, Hawaii To File Lawsuit Against Fossil Fuel Companies, Khon2

5

(Apr. 28, 2025), https://www.khon2.com/local-news/hawaii-to-file-lawsuit-against-fossil-fuel-companies/. The specific theories on which Hawaii would sue are known only to Hawaii, but the goal of the lawsuit is clear—to extract large sums of money from fossil fuel companies for purportedly causing climate change impacts to Hawaii. *See id.* ("'Frankly, fossil fuels deserve to pay their share,' Governor Green said. 'We were able to weather all of those costs, but it would have been nice to have a couple of billion extra dollars from the fossil fuel companies. And I will be negotiating that over time.'").

**The Clean Air Act Comprehensively Regulates Nationwide Air Pollution**

15.     The Clean Air Act, 42 U.S.C. § 7401 et seq., creates a comprehensive program for regulating air pollution in the United States and "displaces" the ability of States to regulate greenhouse gas emissions beyond their borders. *City of New York*, 993 F.3d at 96. The Act improves the Nation's air quality by delegating authority to EPA to prescribe national standards for air pollutants, which States then implement. *See, e.g.*, 42 U.S.C. § 7411.

16.     In *Massachusetts v. EPA*, 549 U.S. 497 (2007), the Supreme Court concluded that greenhouse gases, such as carbon dioxide and methane, are within the Clean Air Act's unambiguous definition of "air pollutant," 42 U.S.C. § 7602(g). *Id.* at 528-529. Thus, the Clean Air Act delegates to EPA authority to

6

set nationwide standards for greenhouse gases. *See Am. Electric Power Co., Inc. v. Connecticut*, 564 U.S. 410, 424-429 (2011) (*AEP*).

17.     For in-state stationary sources, the Clean Air Act generally preserves the ability of States to adopt and enforce air pollution control requirements and limitations on in-state sources, so long as those are at least as stringent as the corresponding federal requirements. *See* 42 U.S.C. § 7416. For out-of-state sources, however, the "Act gives states a much more limited role," even if the pollution from those sources causes harm within their borders. *City of New York*, 993 F.3d at 88. Affected States can: (1) comment on proposed EPA rules and certain permits and plans, *see id*. § 7607(d)(5), § 7475(a)(2), § 7410(a)(2)(C); 40 C.F.R. § 51.102(a); (2) seek judicial review if their concerns are not addressed, *see* 42 U.S.C. § 7607(b); and (3) petition EPA in certain instances, *see id*. § 7410(k)(5).

### The United States' Foreign Policy on Greenhouse Gas Regulation and Energy Development

18.     Greenhouse gas emissions "present[] a uniquely international problem of national concern." *City of New York*, 993 F.3d at 85. Regulating these emissions "implicates" not only "the conflicting rights of states" but also "our relations with foreign nations." *Id.* at 92.

19.     Consistent with the Constitution's allocation of supremacy in the field of foreign policy to the federal government, *see Hines v. Davidowitz*, 312 U.S. 52,

62 (1941), the federal government has demonstrated an active and continuous interest in reconciling protection of the environment, promotion of economic growth, and maintenance of national security when regulating greenhouse gas emissions and fossil fuels, *see City of New York*, 993 F.3d at 93 (recognizing responsibility of federal government in striking the right "balance" in promoting these goals). The federal government has been actively exercising its authority here and has been continually evaluating national interests as is its responsibility under the Constitution. It has "in fact . . . addressed" these interwoven issues on many occasions. *Am. Ins. Ass'n v. Garamendi*, 539 U.S. 396, 421 (2003).

20.    In 1987, Congress enacted the Global Climate Protection Act. *See* Pub. L. No. 100-204, Title XI, §§ 1101–1106, 101 Stat. 1331, 1407–09 (1987), reprinted as note to 15 U.S.C. § 2901. Among its other goals, the Protection Act provided that the United States should "work toward multilateral agreements" on the issue of greenhouse gas emissions. *Id*. § 1103(a)(4), 101 Stat. at 1408. It assigned to the President and EPA the responsibility for devising a "coordinated national policy on global climate change." *Id*. § 1103(b), 101 Stat. at 1408. And the Protection Act assigned to the President and the Secretary of State the responsibility for coordination of climate change policy "in the international arena." *Id*. § 1103(c), 101 Stat. at 1409.

21.     In 1992, President George H. W. Bush signed, and the Senate

unanimously approved, the United Nations Framework Convention on Climate

Change, May 9, 1992, S. Treaty Doc. No. 102-38, 1771 U.N.T.S. 107 (entered into

force Mar. 21, 1994), which has as its "ultimate objective . . . stabilization of

greenhouse gas concentrations in the atmosphere at a level that would prevent

dangerous anthropogenic interference with the climate system." *Id.*, Art. 2.

22.     Under the Framework Convention, "[a]ll Parties," including the

United States, "shall . . . .  (b) [f]ormulate, implement, publish and regularly update

national and, where appropriate, regional programmes containing measures to

mitigate climate change by addressing anthropogenic emissions by sources and

removals by sinks of all greenhouse gases not controlled by the Montreal Protocol,

and measures to facilitate adequate adaptation to climate change [and] (c)

[p]romote and cooperate in the development, application and diffusion, including

transfer, of technologies, practices and processes that control, reduce or prevent

anthropogenic emissions of greenhouse gases not controlled by the Montreal

Protocol in all relevant sectors . . . ." *Id.*, Art. 4.1(b), (c).

23.     The Framework Convention does not set binding limits on greenhouse

gas emissions for individual countries. It contains no enforcement mechanism.

Instead, it includes general obligations addressing climate change and creates a

framework for cooperation by its parties. Among other things, it contemplates the

9

possibility of its parties negotiating "protocols" or other specific international agreements in pursuit of its objective.

24.     Since approving the Framework Convention, the United States has engaged in international efforts regarding climate change and greenhouse gas emissions, balancing foreign policy considerations and domestic energy needs. In particular, the United States is also a party to the Kigali Amendment to the Montreal Protocol. *See* Amendment to the Montreal Protocol on Substances that Deplete the Ozone Layer, Oct. 15, 2016, S. Treaty Doc. No. 117-1, C.N.730.2017. The Amendment commits the United States and other signatory countries to phase down the production and consumption of hydrofluorocarbons, a greenhouse gas. The Senate ratified the Kigali Amendment in 2022, but only after Congress enacted the American Innovation and Manufacturing Act, 42 U.S.C. § 7675 in 2020, giving EPA authority under the Clean Air Act to reduce production and consumption of hydrofluorocarbons.

25.     By contrast, the United States is *not* a party to the Kyoto Protocol of 1997, which provided for greenhouse gas emission reduction targets on UNFCCC Annex I parties, including the United States. Though the United States signed the protocol, President Clinton never submitted it to the Senate for ratification. Instead, the Senate passed a unanimous resolution expressing disapproval of any protocol

10

or other agreement that provides for disparate treatment of economically

developing countries. S. Res. 98, 105th Cong. (1997).

26.     The United States is similarly not a party to the December 12, 2015

Paris Climate Accord (the Paris Agreement). Paris Agreement to the United

Nations Framework Convention on Climate Change, Dec. 13, 2015, in Rep. of the

Conference of the Parties on the Twenty-First Session, U.N. Doc.

FCCC/CP/2015/10/Add.1, annex (2016). In September 2016, President Obama

signed the Paris Agreement but did not submit it to the Senate for ratification. On

March 28, 2017, President Trump described how the United States would seek to

reconcile the Nation's environmental, economic, and strategic concerns. *See* Exec.

Order 13,783, 82 Fed. Reg. 16,093 (Mar. 28, 2017).  On November 4, 2019, the

United States deposited a notification of withdrawal from the Paris Agreement.

Although on February 19, 2021, President Biden announced that he rejoined this

expensive and destructive protocol, on February 13, 2025, President Trump

withdrew the United States from the Paris Agreement. *See* Executive Order 14162,

*Putting America First in International Agreements* § 3(a). The President explained

that "[i]t is the policy of my Administration to put the interests of the United States

and the American people first in the development and negotiation of any

international agreements with the potential to damage or stifle the American

economy" and that such agreements "must not unduly or unfairly burden the

11

United States." *Id*. § 2. In other words, the President would put the interests of the American people first in negotiating the terms of any future treaty to implement the Framework Convention

27.     More recently, on April 2, 2025, President Trump invoked his authority under the International Emergency Economic Powers Act of 1977 to strengthen our Nation's international economic position by imposing reciprocal tariffs on U.S. trading partners. *See* Executive Order 14257, *Regulating Imports With a Reciprocal Tariff To Rectify Trade Practices That Contribute to Large and Persistent Annual United States Goods Trade Deficits*. The Executive Order specifically exempts "energy and energy products" from the tariffs. *Id.* § 3(b); *see also* Annex II.

## CLAIMS FOR RELIEF

### COUNT I
### Clean Air Act Preemption

28.     The United States incorporates by reference all allegations stated above.

29.     The Supremacy Clause of the United States Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the

Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

30.    A state law is preempted under the Supremacy Clause when it intrudes into a field exclusively occupied by federal law (field preemption) or when it conflicts with federal law by standing as an obstacle to the accomplishment of Congress's objectives (conflict preemption). *See City of Milwaukee v. Illinois*, 451 U.S. 304, 316-17 (1981) (field preemption); *Hillsborough County v. Automated Medical Labs., Inc.*, 471 U.S. 707, 713 (1985) (conflict preemption).

31.    Hawaii's state law claims are preempted by the Clean Air Act, 42 U.S.C. §§ 7401 et seq., because they impermissibly regulate out-of-state greenhouse gas emissions and obstructs the Clean Air Act's comprehensive federal-state framework and EPA's regulatory discretion, *see, e.g.*, *Int'l Paper Co. v. Ouellette*, 479 U.S. 481, 500 (1987) ("The [Clean Water] Act pre-empts state law to the extent that the state law is applied to an out-of-state point source."); *Arizona*, 567 U.S. at 399-400 (discussing preemption).

32.    "The Clean Air Act is a comprehensive statutory scheme that anoints the EPA as the 'primary regulator of [domestic] greenhouse gas emissions." *City of New York*, 993 F.3d at 99 (quoting *AEP*, 564 U.S. at 428).

33.    Congress delegated to EPA the authority to determine whether and how to regulate greenhouse gas emissions, thereby displacing federal common law

13

claims and occupying the field of interstate air pollution regulation. *See Massachusetts*, 549 U.S. at 528-29 (holding that greenhouse gases are "air pollutants" under 42 U.S.C. § 7602(g)); *AEP*, 564 U.S. at 426 ("The critical point is that Congress delegated to EPA the decision whether and how to regulate carbon-dioxide emissions . . . the delegation displaces federal common law."); *City of Milwaukee v. Illinois*, 451 U.S. 304, 317 (1981) (holding that the Federal Water Pollution Control Act's comprehensive regulatory program displaced federal common law of nuisance, as Congress occupied the field of water pollution regulation).

34. The Clean Air Act's comprehensive framework, which includes specific provisions for regulating emissions from stationary and mobile sources (*see, e.g.*, 42 U.S.C. §§ 7410, 7411, 7521), preempts state attempts to regulate out-of-state greenhouse gas emissions. *See City of New York*, 993 F.3d at 90-100. Hawaii's claims seeking to hold fossil fuel businesses liable for global greenhouse gas emissions usurp this federal authority. Hawaii's attempt to make fossil fuel companies "pay their share" for greenhouse gas emissions worldwide, most of which occur outside Hawaii's borders, is the type of state regulation of out-of-state greenhouse gas emissions preempted by the Clean Air Act. Sam Spangler, Hawaii To File Lawsuit Against Fossil Fuel Companies, Khon2 (Apr. 28, 2025),

https://www.khon2.com/local-news/hawaii-to-file-lawsuit-against-fossil-fuel-companies/.

35.     Hawaii's state law claims conflict with the Clean Air Act's purposes and objectives by undermining its carefully calibrated cooperative federalism scheme and EPA's discretion in regulating greenhouse gas emissions.

36.     The Clean Air Act establishes a structured partnership between the federal government and States, allowing States to regulate in-state stationary sources under specific conditions, *see, e.g.*, 42 U.S.C. §§ 7401(a)(3), 7410(a)(2)(C), 7411(d), 7416, but limiting their role in regulating out-of-state or global emissions, see, e.g., 42 U.S.C. §§ 7410(a)(2)(C), 7410(k)(5), 7475(a)(2), 7607(b). *See also City of New York*, 993 F.3d at 88. And the Clean Air Act contains a citizen-suit savings clause. 42 U.S.C. § 7604(e). When read together, the Clean Air Act "plainly permit[s] [S]tates to create and enforce their own emissions standards applicable to in-state polluters." *City of New York*, 993 F.3d at 99. This role "no doubt holds true for both state legislation and common law claims under state law." *Id*. at 100 (citing *Merrick v. Diageo Americas Supply, Inc.*, 805 F.3d 685, 690-91 (6th Cir. 2015)). "But that authorization is narrowly circumscribed, and has been interpreted to permit only state lawsuits brought under 'the law of the [pollution's] *source* [s]tate.'" *Id*. (citations omitted).

15

37.     Hawaii's anticipated lawsuit "does not seek to take advantage of this slim reservoir of state common law." *City of New York*, 993 F.3d at 99. Rather, the State's suit interferes with the Clean Air Act's balance by effectively regulating out-of-state emissions. This extraterritorial regulation creates a patchwork of state-level penalties that undermines state authority over pollution sources within state borders and frustrates the Clean Air Act's goal of efficiency and predictability in the permit system. *See Ouellette*, 479 U.S. at 496; *see also AEP*, 564 U.S. at 426 (holding that the Clean Air Act's delegation to the EPA to regulate greenhouse gas emissions displaces federal common law, reflecting federal primacy). Such state encroachment on federal authority is preempted, as it obstructs the Clean Air Act's integrated approach to air pollution control. *See Ouellette*, 479 U.S. at 497; *see also City of New York*, 993 F.3d at 90-95.

38.     Moreover, Hawaii's anticipated lawsuit obstructs EPA's discretion to balance environmental, economic, and energy considerations in regulating greenhouse gases. The Clean Air Act grants EPA broad authority to promulgate regulations based on its expert judgment, including whether to impose emissions standards for stationary sources under 42 U.S.C. § 7411 and for mobile sources under 42 U.S.C. § 7521. By imposing retroactive liability for lawful conduct, Hawaii would second-guess EPA's regulatory choices and imposes penalties that Congress did not authorize.

16

39.     Hawaii's state law claims would further undermine federal objectives by increasing energy costs and disrupting the national energy market, contrary to the Clean Air Act's integration with national energy policy. As noted in Executive Order 14156 (¶ 2), insufficient energy production due to restrictive state policies threatens national security and economic prosperity. By targeting major fossil fuel businesses, many of which operate on federal lands or supply federal agencies, Hawaii's anticipated lawsuit would raise costs for federal operations and consumers nationwide, obstructing the Clean Air Act's goal of balancing environmental protection with economic growth. *See* 42 U.S.C. § 7401(b)(1) (CAA's purpose includes protecting air quality "to promote the public health and welfare and the productive capacity of its population").

40.     If Hawaii is permitted to pursue these sorts of state law claims, other States could pursue similar claims, leading to a chaotic "patchwork" of regulations that undermine the national interest in readily available and affordable energy and the government's ability to effectively administer coherent national environmental policy and regulation of global pollution. *City of New York*, 993 F.3d at 86. Such fragmentation would frustrate Congress's intent for a unified federal approach to global air pollution. *See Hines*, 312 U.S. at 67 (state law preempted when it obstructs federal objectives).

41.     Thus, Hawaii's state law claims are preempted by the Clean Air Act.

17

## COUNT II
## Unconstitutional Extraterritorial Regulation

42.     The United States incorporates by reference all allegations stated

above.

43.     The Constitution's structure and provisions, including the Due

Process Clause, as well as concepts of State sovereignty and federalism, prohibit a

State from regulating transactions, and imposing liability for conduct, occurring

outside its borders. Hawaii's state law claims violate the Constitution by imposing

extraterritorial liability for primarily out-of-state extraction and refining activities

and out-of-state greenhouse gas emissions. Hawaii's anticipated lawsuit is

irreconcilable with the Constitution's commitment of such matters to the federal

government and the relative rights and obligations of the federal government and

the States under the Constitution.

44.     The United States has standing to assert this claim to protect its

sovereign, proprietary, and parens patriae interests. Hawaii's anticipated lawsuit,

which would seek extraterritorial liability, interferes with the federal government's

authority to regulate interstate and foreign commerce and greenhouse gas

emissions, undermining national energy policy. The financial burdens of Hawaii's

anticipated lawsuit on fossil fuel businesses increase the United States' costs for

purchasing fuels and threaten revenue from federal leasing. In its parens patriae

capacity, the United States seeks to protect citizens nationwide from higher energy

18

costs and economic disruption caused by Hawaii's anticipated overreach, which
individual litigants cannot fully address due to the nationwide impact of Hawaii's
state law claims.

45.     The Due Process Clause of the Fourteenth Amendment provides:
"[N]or shall any State deprive any person of life, liberty, or property, without due
process of law . . . ." U.S. Const. amend. XIV, § 1. The fossil fuel businesses
targeted by Hawaii's state law claims are persons under the Fourteenth
Amendment.

46.     The Constitution's structure and principles of due process mandate
that while States are sovereign within their borders, they cannot regulate conduct
beyond their borders, such as by imposing liability for pollution from out-of-state
sources. "The concept of Due Process constraints on a state legislature's ability to
regulate subject matters and transactions beyond the state's boundaries, while
perhaps infrequently litigated in those terms, is not new." *Gerling Glob.
Reinsurance Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1236-37 (11th Cir. 2001)
(discussing Due Process limits on legislative jurisdiction). Indeed, "[t]o resolve
disputes about the reach of one State's power," the Supreme Court "has long
consulted … the Constitution's structure and the principles of 'sovereignty and
comity' it embraces," along with "the Due Process Clause." *Nat'l Pork Producers
Council v. Ross*, 598 U.S. 356, 376 (2023) (citation omitted).

19

47.     It is a well-established "due process principle that a state is without power to exercise 'extra territorial jurisdiction,' that is, to regulate and control activities wholly beyond its boundaries." *Watson v. Emps. Liab. Assur. Corp.*, 348 U.S. 66, 70 (1954) (citing *Home Ins. Co. v. Dick*, 281 U.S. 397 (1930)). "The sovereignty of each State, in turn, implie[s] a limitation on the sovereignty of all of its sister States—a limitation express or implicit in both the original scheme of the Constitution and the Fourteenth Amendment." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 293 (1980).

48.     Indeed, the Due Process Clause embodies "more than a guarantee of immunity from inconvenient or distant litigation" but also imposes "territorial limitations on the power of the respective States." *Bristol-Myers Squibb Co. v. Superior Ct. of California, San Francisco Cnty.*, 582 U.S. 255, 263 (2017) (quoting *Hanson v. Denckla*, 357 U.S. 235, 251 (1958)) (discussing how the sovereignty of each state imposes limitations on sovereignty of other states).

49.     No single State can enact policies for the entire Nation, nor can a State "even impose its own policy choice on neighboring States." *BMW of N. Am., Inc. v. Gore*, 517 U.S. 559, 570-71 (1996). "[I]t follows from these principles of state sovereignty and comity that a State may not impose economic sanctions on violators of its laws with the intent of changing the tortfeasors' lawful conduct in other States." *Id.* at 572. "The states are not nations, either as between themselves

or towards foreign nations," and "their sovereignty stops short of nationality." *New Hampshire v. Louisiana*, 108 U.S. 76, 90 (1883). And "interstate . . . pollution is a matter of federal, not state, law." *Ouellette*, 479 U.S. at 488.

50.     Hawaii's state law claims violate the Constitution's structure and principles of due process by seeking to impose economic sanctions on fossil fuel businesses for economic activities that occurred primarily in other States and around the world.

51.     Hawaii's anticipated lawsuit would improperly seek to "impose strict liability for the damages caused by fossil fuel emissions no matter where in the world those emissions were released (or who released them)," *City of New York*, 993 F.3d at 93, including activities in other States and in foreign countries with no connection to Hawaii. "Such a sprawling" scope "is simply beyond the limits of state law." *Id.* at 92.

52.     Even if an entity has some contacts with Hawaii, such as in-state sales or operations, Hawaii's effort to collect damages for out-of-state greenhouse gas emissions does not arise from or relate to those contacts, violating the requirement that a State's regulatory authority be limited to conduct with a substantial nexus to the State.

53.     Moreover, the global scope of Hawaii's state law claims inherently overreaches by seeking to regulate conduct far beyond Hawaii's territorial

jurisdiction, contravening the Due Process Clause's territorial limitations on state sovereignty.

54.     Thus, Hawaii's state law claims violate the Constitution's limits on extraterritorial legislation.

## COUNT III
## Violation of the Interstate Commerce Clause

55.     The United States incorporates by reference all allegations stated above.

56.     The Constitution gives Congress "Power . . . [t]o regulate Commerce . . . among the several States." U.S. Const. art. I, § 8, cl. 3.

57.     State laws that discriminate against interstate commerce are unconstitutional, even in the absence of federal legislation regulating the activity in question. *Oklahoma Tax Comm'n v. Jefferson Lines, Inc.*, 514 U.S. 175, 179 (1995).

58.     Hawaii's state law claims discriminate against interstate commerce facially, in practical effect, and in purpose by targeting commercial activity—fossil fuel extraction and refining—that occurs primarily if not exclusively in States other than Hawaii, including Texas, New Mexico, Louisiana, West Virginia, Pennsylvania, Oklahoma, and North Dakota.

59.     Because Hawaii's state law claims discriminate against interstate commerce, strict scrutiny applies, and its anticipated lawsuit can be pursued only if

22

"it advances a legitimate local purpose that cannot be adequately served by reasonable nondiscriminatory alternatives." *New Energy Co. of Indiana v. Limbach*, 486 U.S. 269, 278 (1988).

60.     Upon information and belief, Hawaii has no legitimate local public interest in discriminating against interstate commerce.

61.     Moreover, even if Hawaii's state law claims did not facially discriminate against interstate commerce and did not have non-discriminatory alternatives, it would still violate the Interstate Commerce Clause under the balancing test articulated in *Pike v. Bruce Church, Inc.*, 397 U.S. 137, 142 (1970). Under *Pike*, a state law that regulates evenhandedly and has only incidental effects on interstate commerce is unconstitutional if the burden imposed on interstate commerce is "clearly excessive in relation to the putative local benefits." *Id.*

62.     Hawaii's anticipated lawsuit would also impose substantial burdens on interstate commerce. By targeting fossil fuel businesses for extraction and refining activities and greenhouse gas emissions occurring primarily in other States and foreign countries, Hawaii would disrupt the national market for fossil fuels. Hawaii's request for damages would increase energy costs for consumers and businesses nationwide, as these costs are passed through the interstate energy market. The potential for other States to adopt similar laws creates a risk of regulatory fragmentation, undermining the uniform national energy market.

23

63.     Hawaii's state law claims would impose a substantial and undue burden on interstate commerce that is clearly excessive in relation to any putative local benefits.

64.     Thus, Hawaii's anticipated lawsuit would violate the Interstate Commerce Clause.

## COUNT IV
### Violation of the Foreign Commerce Clause

65.     The United States incorporates by reference all allegations stated above.

66.     The Constitution provides that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

67.     The Constitution gives Congress the "Power . . . [t]o regulate Commerce with foreign Nations . . . ." U.S. Const. art. I, § 8, cl. 3.

68.     The Foreign Commerce Clause has a negative application. Thus, for example, State laws that impose taxes on foreign commerce "will not survive Commerce Clause scrutiny if the taxpayer demonstrates that the tax" implicates one of the four concerns identified in *Complete Auto Transit, Inc. v. Brady*, 430 U.S. 274, 279 (1977). A State law imposing taxes is unconstitutional if it (1)

24

applies to an activity lacking a substantial nexus to the State; (2) is not fairly

apportioned; (3) discriminates against interstate commerce; *or* (4) is not fairly

related to the services provided by the State. *See Barclays Bank PLC v. Franchise*

*Tax Bd. Of California*, 512 U.S. 298, 310-11 (1994) (citing *Complete Auto*, 430

U.S. at 279). "In the unique context of foreign commerce, a State's power is

further constrained because of the special need for federal uniformity." *Id.* at 311

(cleaned up). Thus, "[a] tax affecting *foreign* commerce therefore raises two

concerns in addition to the four delineated in *Complete Auto*." *Id.* "The first is

prompted by the enhanced risk of multiple taxation. The second relates to the

Federal Government's capacity to speak with one voice when regulating

commercial relations with foreign governments." *Id.* (cleaned up).

69.     Hawaii's anticipated lawsuit is not a state tax. But the same limiting

principles that apply to a State's power to impose taxes on foreign commerce also

apply to a State's power to impose penalties, fines, and other civil liability on

foreign commerce.

70.     Hawaii's state law claims discriminate against foreign commerce

facially, in practical effect, and in purpose by imposing penalties or fines that

directly and substantially burden foreign commerce. Hawaii would seek to impose

liability on fossil fuel businesses for activities—extraction and refining of fossil

fuels—that occurred "worldwide" in foreign countries. Hawaii would seek to

impose liability on these foreign activities even though they lack a substantial nexus to Hawaii. Hawaii also would discriminate against foreign commerce and imposes liability that is not fairly related to the services provided by the State. Hawaii's anticipated lawsuit would enhance the risk of multiple States imposing overlapping liability on foreign commerce for the same activities. And it would harm the federal government's capacity to speak with one voice when conducting commercial relations with foreign governments on issues such as regulation of greenhouse gas emissions, trade policy, exports and imports of fossil fuels, and national security.

71.     The United States does not challenge Hawaii's authority to regulate the local activities of international corporations, such as emissions from in-state facilities or taxes on in-state sales. Ordinary state regulations that incidentally affect foreign commerce without such extraterritorial scope or federal interference remain permissible under the Foreign Commerce Clause. But Hawaii's anticipated lawsuit does not fall within this permissible role for States. Rather, Hawaii's attempt to take "a couple billion extra dollars from the fossil fuel companies" for worldwide extraction and refining with minimal nexus to Hawaii, imposes a disproportionate burden on foreign commerce, and undermine the federal government's ability to maintain uniformity in regulating environmental, trade, and national security policy.

26

72.     Thus, Hawaii's state law claims violate the Foreign Commerce

Clause.

## COUNT V
## Foreign Affairs Preemption

73.     The United States incorporates by reference all allegations stated

above.

74.     The Constitution provides that "[t]his Constitution, and the Laws of

the United States which shall be made in Pursuance thereof; and all Treaties made,

or which shall be made, under the Authority of the United States, shall be the

supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State

to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2.

75.     Even aside from his military powers as the "Commander in Chief of

the Army and Navy," U.S. Const. art. II, § 2, cl. 1, the Constitutions vests broad

responsibility for the conduct of foreign affairs in the President of the United

States.

76.     The President has "Power, by and with the Advice and Consent of the

Senate, to make Treaties, provided two thirds of the Senators present concur." *Id*.,

art. II, § 2, cl. 2.

77.     The President "nominate[s], and by and with the Advice and Consent

of the Senate, . . . appoint[s] Ambassadors, other public Ministers and Consuls."

*Id*.

27

78.     The President "receive[s] Ambassadors and other public Ministers."
*Id*., , art. II, § 3

79.     The Constitution authorizes the President to "take Care that the Laws
be faithfully executed." *Id*.

80.     In short, "the supremacy of the national power in the general field of
foreign affairs . . . is made clear by the Constitution." *Hines*, 312 U.S. at 62.

81.     The Supreme Court has interpreted the provisions of the Constitution
that vest authority over foreign affairs in the President to prohibit actions by the
States that lie outside their traditional and localized areas of responsibility and
instead interfere with the federal government's foreign policy, or otherwise has
more than an incidental effect in conflict with express foreign policy. *See
Garamendi*, 539 U.S. at 418-20.

82.     Hawaii's state law claims fall outside the area of any traditional state
interest. They instead regulate "a uniquely international problem" that is "not well-
suited to the application of state law." *City of New York*, 993 F.3d at 85-86.

83.     By adopting the Framework Convention, the federal government
undertook to formulate foreign policy with respect to the "stabilization of
greenhouse gas concentrations in the atmosphere at a level that would prevent
dangerous anthropogenic interference with the climate system."  Framework
Convention, Art. 2.

28

84.     By attempting to impose liability based on greenhouse gas emissions purportedly attributable to worldwide fossil fuel extraction and refining, Hawaii's anticipated lawsuit could undermine the ability of the United States to speak with one voice on a matter of pressing interest around the globe. Hawaii's state law claims also could complicate the United States' relations with foreign countries concerning regulation of greenhouse gas emissions, trade policy, and exports and imports of fossil fuels. And Hawaii's state law claims penalize extraction and refining activities in foreign countries despite the President's explicit judgment that energy imports should be exempt from the tariffs imposed under Executive Order 14257.

85.     Hawaii's anticipated lawsuit interferes with the United States' foreign policy on greenhouse gas regulation, including but not limited to the United States' participation in the Framework Convention and announcement of its intention to withdraw from the Paris Agreement, and is therefore preempted.

86.     This claim does not challenge Hawaii's authority to enact local regulations that incidentally affect international corporations, such as environmental standards for in-state operations. Instead, the United States seeks to prevent Hawaii from pursuing its state law claims because its imposition of liability for worldwide greenhouse gas emissions directly intrudes on the federal government's exclusive authority over foreign affairs, including the United

29

Nations Framework Convention on Climate Change and trade policy. This extraordinary extraterritorial reach and conflict with federal foreign policy distinguish Hawaii's state law claims from ordinary state regulations that do not undermine the United States' ability to speak with one voice in international relations.

87. Simply put, Hawaii's attempt "to recover damages for the harms caused by global greenhouse gas emissions may" not "proceed under [Hawaii] law." *City of New York*, 993 F.3d at 91.

88. Thus, Hawaii's state law claims are preempted by the foreign affairs doctrine.

## **PRAYER FOR RELIEF**

WHEREFORE, the United States respectfully requests that this Court:

A.      Declare Hawaii's state law claims unconstitutional under 28 U.S.C.

§ 2201;

B.      Permanently enjoin Defendants from taking actions to assert Hawaii's

state law claims;

C.      Award the United States its costs and disbursements in this action;

and

D.      Award such other and further relief as the Court may deem just and

proper.

Respectfully submitted,

ADAM R.F. GUSTAFSON
Acting Assistant Attorney General

ROBERT N. STANDER
Deputy Assistant Attorney General

s/ Justin D. Heminger
JUSTIN D. HEMINGER
Attorney
Environment and Natural Resources Division
U.S. Department of Justice
Post Office Box 7415
Washington, D.C. 20044
Telephone: (202) 514-2689
Facsimile: (202) 305-0506
Email: justin.heminger@usdoj.gov

IN THE CIRCUIT COURT OF THE FIRST CIRCUIT

STATE OF HAWAI'I

| | |
|---|---|
| STATE OF HAWAI'I, ex rel. ANNE E. LOPEZ, ATTORNEY GENERAL,<br><br>                        Plaintiff,<br><br>v.<br><br>BP P.L.C.; BP AMERICA INC.; BP PRODUCTS NORTH AMERICA INC.; CHEVRON CORP.; CHEVRON U.S.A. INC.; EXXON MOBIL CORP.; EXXONMOBIL OIL CORPORATION; SHELL P.L.C.; SHELL USA, INC.; EQUILON ENTERPRISES LLC d/b/a SHELL OIL PRODUCTS US; SHELL TRADING (US) COMPANY; SUNOCO LP; ALOHA PETROLEUM, LTD.; ALOHA PETROLEUM LLC; CONOCOPHILLIPS; CONOCOPHILLIPS COMPANY; PHILLIPS 66; PHILLIPS 66 COMPANY; WOODSIDE ENERGY HAWAII INC. f/k/a BHP HAWAII INC.; AMERICAN PETROLEUM INSTITUTE; and DOES 1 through 100, inclusive,<br><br>                        Defendants. | **CIVIL NO. 1CCV-25-0000717 (JJK)**<br>**(Other Non-Vehicle Tort)**<br><br>**NOTICE OF HEARING MOTION AND CERTIFICATE OF SERVICE** |

## NOTICE OF HEARING MOTION

TO:    ANNE E. LOPEZ, ESQ.
           Attorney General of Hawai'i

           MELISSA J. KOLONIE, ESQ.
           WADE H. HARGROVE III, ESQ.
           LYLE T. LEONARD, ESQ.
           Deputy Attorneys General
           Department of the Attorney General
           425 Queen Street
           Honolulu, Hawai'i  96813

VICTOR M. SHER, ESQ. (*Pro Hac Vice* forthcoming)
MATTHEW K. EDLING, ESQ. *(Pro Hac Vice* forthcoming*)*
STEPHANIE D. BIEHL, ESQ. *(Pro Hac Vice* forthcoming)
WILLIAM LIANG, ESQ.
Sher Edling LLP
100 Montgomery Street, Suite 1410
San Francisco, California 94104

Attorneys for Plaintiff
STATE OF HAWAIʻI

NOTICE IS HEREBY GIVEN that the foregoing Motion shall come on for hearing before the Honorable Jordon J. Kimura, Judge of the above-entitled Court, in his courtroom, Kaahumanu Hale (First Circuit Court), 777 Punchbowl Street, 4th Floor, Courtroom 18, Honolulu, Hawaii, on Wednesday, July 30, 2025 at 9:30 a.m., or as soon thereafter as counsel may be heard.

DATED: Honolulu, Hawaiʻi, June 17, 2025.

*/s/ Melvyn M. Miyagi*
MELVYN M. MIYAGI
ROSS T. SHINYAMA
SUMMER H. KAIAWE
WATANABE ING LLP

THEODORE J. BOUTROUS, JR. (*Pro Hac Vice* forthcoming*)*
TIAUNIA N. HENRY (*Pro Hac Vice* forthcoming)
ANDREA E. SMITH (*Pro Hac Vice* forthcoming*)*
JOSHUA D. DICK (*Pro Hac Vice* forthcoming*)*
MICHAEL K. MURPHY (*Pro Hac Vice* forthcoming)
PETER E. SELEY (*Pro Hac Vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP

ERICA W. HARRIS (*Pro Hac Vice* forthcoming*)*
SUSMAN GODFREY LLP

Attorneys for Defendants
**CHEVRON CORP. and CHEVRON USA INC.**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this day, a copy of the foregoing will be duly

served upon the above-referenced parties, through their counsel, electronically via JEFS.

DATED: Honolulu, Hawaiʻi, June 17, 2025.

/s/ Melvyn M. Miyagi
MELVYN M. MIYAGI
ROSS T. SHINYAMA
SUMMER H. KAIAWE
WATANABE ING LLP

THEODORE J. BOUTROUS, JR. (*Pro Hac Vice* forthcoming*)*
TIAUNIA N. HENRY (*Pro Hac Vice* forthcoming)
ANDREA E. SMITH (*Pro Hac Vice* forthcoming*)*
JOSHUA D. DICK (*Pro Hac Vice* forthcoming*)*
MICHAEL K. MURPHY (*Pro Hac Vice* forthcoming)
PETER E. SELEY (*Pro Hac Vice* forthcoming)
GIBSON, DUNN & CRUTCHER LLP

ERICA W. HARRIS (*Pro Hac Vice* forthcoming*)*
SUSMAN GODFREY LLP

Attorneys for Defendants
**CHEVRON CORP. and CHEVRON USA INC.**