2026 WL 194031
Only the Westlaw citation is currently available.
United States District Court, W.D.
Michigan, Southern Division,
SOUTHERN DIVISION.

UNITED STATES OF AMERICA, Plaintiff,
v.
STATE OF MICHIGAN, et al., Defendants.

Case No. 1:25-cv-496
|
Filed 01/24/2026

**Attorneys and Law Firms**

Adam R.F. Gustafson, John Kenneth Adams, Robert Nolan Stander, Justin Heminger, U.S. Department of Justice (ENRD) Environmental Crimes Section, Washington, DC, for Plaintiff.

David Uhlmann, Marten Law, PLLC, Washington, DC, Richard S. Kuhl, Office of the Attorney General (ENRA), Lansing, MI, for Defendants.

### OPINION AND ORDER

JANE M. BECKERING United States District Judge

 *1  The federal government has brought this action for declaratory and injunctive relief against the State of Michigan, the governor of the State of Michigan, and the attorney general of the State of Michigan (the "Michigan Defendants"). The federal government alleges that the Michigan Defendants may bring certain unspecified claims, against certain unspecified non-party defendants with some connection to the "fossil fuel" industry, at an unspecified point in the future, and that a subset of those unspecified claims may be preempted by one or more federal laws, causing a cascading series of injuries to the federal government. For the reasons stated in greater detail below, the Court will grant the Michigan Defendants' motion to dismiss based on the federal government's failure to carry its burden and establish this Court's subject-matter jurisdiction.[1]

### I. BACKGROUND

#### A. Factual Background[2]

The federal government has filed an Amended Complaint seeking declaratory and injunctive relief based on statements made by the Michigan Defendants, including the following:

- The solicitation of proposals from law firms "to pursue litigation related to the climate change impacts caused by the fossil fuel industry" and the Michigan Attorney General's stated intent to pursue that litigation; and

- The Michigan Attorney General's refusal "to disavow her intent to bring state-law claims in state court for global greenhouse gas emissions, even when given an opportunity to 'end this law-suit' in exchange for such a disavowal."

(Opp., ECF No. 19 at PageID.187, citing Am. Compl., ECF No. 8 at PageID.94).

The federal government does not allege that the Michigan Defendants intend to bring an action against the United States to which it raises a pre-enforcement challenge (*see generally* Am. Compl., ECF No. 8). Instead, the federal government seeks to preclude the Michigan Defendants from filing any state-law claims against "fossil fuel companies to seek damages for alleged climate change harms" (*id.* at PageID.66). According to the federal government:

 *2  Michigan plans to file litigation seeking to hold fossil fuel companies liable for purported contributions to greenhouse gas emissions, as its Attorney General has made clear both by word and deed. Michigan has even entered a contract with three law firms to file that litigation and appointed attorneys at those firms to be Special Assistant Attorneys General to litigate the case.
....

[The Michigan Attorney General] issued a request for proposals from private attorneys and law firms "to pursue litigation related to the climate change impacts caused by the fossil fuel industry on behalf of the State of Michigan" ... [and disseminated a] Statement of Work confirm[ing] that [the state] sought "to pursue constitutional, statutory, tort and other applicable common-law claims extending to the deception and other wrongful actions by the fossil fuel industry to require the parties who

# EXHIBIT 1

profited from hiding the consequences of fossil fuel use to bear the costs of climate change on Michigan."

....

It further asserted, "The fossil fuel industry has known for decades that the use of fossil fuel products creates greenhouse gas pollution that warms the planet and leads to climate change .... The work to be performed consists of assisting ... in gathering needed information, determining what claims will be brought, drafting the complaints (as appropriate), conducting affirmative and defensive discovery, taking and defending depositions, motion practice, and preparing for and conducting any trials that may proceed."

(Am. Compl., ECF No. 8 at PageID.68–69, cleaned up).

The Amended Complaint states that, as of the date it was submitted to the Court, "Michigan ha[d] not yet filed its Climate litigation" (*id.* at PageID.70). Instead, the Amended Complaint alleges that the Michigan Attorney General is "gathering needed information" and "identifying" whether "viable claims and causes of action" exist as to "possible defendants" (*id.* at PageID.104–105). Nevertheless—the Amended Complaint asserts—"it is no mystery what claims" are forthcoming (*id.* at PageID.70). The federal government explains that one of the three law firms engaged by the Michigan Defendants has previously filed cases that resemble one another and involve "[state] and common law claims" against fossil fuel companies (*id.*). The Amended Complaint then asserts that all "state-law claims by a state seeking to hold fossil fuel companies liable for out-of-state emissions or conduct are preempted by federal law" (*id.*).

The federal government's prayer for relief requests that this Court: "(A) Declare Michigan's *state law claims* unconstitutional under 28 U.S.C. § 2201; [and] (B) Permanently enjoin Defendants from taking actions to assert Michigan's *state law claims*" (*id.* at PageID.92) (emphasis added). The phrase "state law claims" is not expressly defined—the Amended Complaint seeks to challenge any such claims before they even exist (*id.* at PageID.70, 92).

### B. Background Regarding State Attorney General Public Interest Litigation

The Amended Complaint seeks to terminate at the inception a potential litigation strategy that the federal government alleges the Michigan Defendants may be investigating. Specifically, the federal government alleges that the Michigan Defendants may file one or more claims that may be subject to one or more federal preemption defenses. Instead of intervening in the lawsuit once it has been filed or waiting for specific industry defendants to assert federal preemption defenses on their own behalf, the federal government seeks to litigate these defenses now, in the abstract and in advance, as those unspecified defenses may relate to a broad category of state-law claims brought against any defendant associated with the "fossil fuel industry." The federal government's lawsuit represents an escalation in a decades-long series of clashes between state attorneys general and industry groups, and this section briefly provides context relevant to the dispute at bar.

#### 1. The State Attorney General, Comity, and Federalism

**\*3** "The [English] office of attorney general"—to which present day state attorneys general trace their source—"is older than the United States." *See State of Fla. ex rel. Shevin v. Exxon Corp.*, 526 F.2d 266, 268 (5th Cir. 1976). Unlike the United States Attorney General, the vast majority of state attorneys general are elected and "directly accountable, through the electoral process, to the citizens of their respective states." *See* Trevor W. Morrison, The State Attorney General and Preemption, CORNELL L. REV. (2008), available at https://perma.cc/WE8N-P86U (hereinafter "Morrison"). [3] The Michigan Attorney General is popularly elected. *See id.*; *Buck v. Gordon*, 959 F.3d 219, 221 (6th Cir. 2020) (noting the election of the current Michigan governor and Michigan attorney general in 2018).

"[A]s a matter of institutional design, state-by-state election of state attorneys general makes them well situated to deliver at least some of federalism's benefits of decentralization," including their ability to represent the localized concerns of their constituents and give voice to dissenting viewpoints. [4] *See* Morrison, *supra* at 6. As one scholar has noted:

> [T]he state attorney general [is] a democratically accountable officer charged with safeguarding the public and, to that end, invested with broad-ranging authority to monitor compliance with state (and sometimes federal) laws and to initiate lawsuits or other enforcement actions when necessary. This combination of accountability and authority makes the attorney general a particularly important state institution.

Although there certainly are occasions in which federal law needs to displace this institution in order to advance some overarching national regulatory goal, such displacement carries substantial costs. Given those costs, it is sensible to pause before construing any particular federal law to preempt the work of the state attorney general.

Morrison, *supra* at 8; *accord United States v. Locke*, 529 U.S. 89, 109 (2000) ("It is fundamental in our federal structure that States have vast residual powers. Those powers, unless constrained or displaced by the existence of federal authority or by proper federal enactments, are often exercised in concurrence with those of the National Government.")

### 2. State Attorney General Actions Against National Industry Groups

The Michigan Defendants' climate change action, as described in the Amended Complaint, would potentially join a long line of state attorney general public interest actions brought against national industry groups in areas that are heavily regulated by the federal government. This section provides concise background on these predecessor actions.

**\*4 Antitrust Litigation.** In the 1980s, after the executive branch reduced the staff of the Federal Trade Commission by half,[5] state attorneys general initiated a series of consumer protection and antitrust actions against major corporations in the oil, auto, and pharmaceutical industries.[6] Some of these actions recovered millions of dollars on behalf of the attorney generals' constituents and resulted in industry defendants agreeing to an injunction against price-fixing.[7]

**Tobacco Litigation.** "In the mid–1990s, the attorneys general of several states brought suit against the major tobacco companies for the reimbursement of state costs associated with smoking." *United States v. Philip Morris USA Inc.*, 566 F.3d 1095, 1131–32 (D.C. Cir. 2009). Five major tobacco companies entered into "a settlement agreement, the MSA, with forty-six states and the District of Columbia ... [prohibiting] youth marketing [and] any material misrepresentations regarding the health consequences of tobacco use[.]" *Id.* Scholars have noted that the "state [tobacco] lawsuits were filed in large part because the federal government was not adequately regulating the tobacco industry." *See* Mark C. Miller, *State Attorneys General,* 48 J. LEGIS. 1, 5 (2021). For example, although the Food and Drug Administration initially proposed a rule to "regulate the sale of cigarettes and smokeless tobacco to children" in 1995, after the tobacco industry challenged the rule, "the FDA [and Congress] did not assert the power to regulate tobacco products" for "nearly a decade thereafter," underscoring the significance of the nationwide settlement achieved by the state attorneys general. *See Kealani Distribution LLC v. Food & Drug Admin.*, No. 4:22-CV-856-SDJ, 2025 WL 474904, at \*1–2 (E.D. Tex. Feb. 12, 2025).

**Lead Paint Litigation.** "Success with tobacco further encouraged" state attorney general actions loosely patterned on that litigation. *See* Leslie Kendrick, *The Perils and Promise of Public Nuisance*, 132 YALE L.J. 702, 725 (2023) (hereinafter "Kendrick"). This included a successful action by the California Attorney General against manufacturers of lead paint alleging that they had engaged in misleading "advertising campaigns promoting paint throughout the first half of the 20th century" that resulted in a public nuisance actionable under state law. *See People v. ConAgra Grocery Prods. Co.,* 17 Cal. App. 5th 51, 72 (2017) (noting that a paint industry trade association "promoted lead paint for interior residential use" with knowledge dating back to the 1930s that "lead poisoning [associated with lead paint] disproportionately affected poor and minority children and that there were thousands of cases annually"). Paint industry trade associations nevertheless "fought against the imposition of regulations on lead," and federal regulators did not ban lead paint for residential use until 1978. *See id.*; *Cnty. of Santa Clara v. Atl. Richfield Co.*, 137 Cal. App. 4th 292, 302 (2006). The lead paint litigation brought by state attorneys general has resulted in the industry paying millions of dollars to abate the damage caused by the residential use of lead paint products. *See* Kendrick, *supra* at 725.

**\*5** As particularly notable here, in *Sherwin-Williams v. Cnty. of Delaware*, a major paint manufacturer filed an action to preemptively shield itself from lead paint litigation that several government entities "seemed poised to file with the assistance of outside counsel[.]" *See* 968 F.3d 264, 266 (3d Cir. 2020). The Third Circuit affirmed a district court's dismissal for lack of subject-matter jurisdiction because "the company's constitutional claims ... rest on what it anticipates the County might allege in a hypothetical lawsuit. Such speculation cannot satisfy Article III's standing requirements." *Id.* at 270 (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 241) (explaining that federal courts may not issue "opinion[s] advising what the law would be upon a hypothetical state of facts").

**Opioid Litigation.** Several state attorneys general later filed actions against defendants in the pharmaceutical industry, with some similarities between their claims and those filed in the tobacco and lead paint cases discussed above. State attorneys general and other local government entities have alleged—with variation from case to case depending on the jurisdiction at issue—that opioid manufacturers disseminated "false and misleading marketing, including minimizing safety risks, taking data out of context, omitting material information, overstating safety and efficacy, and broadening the product indication" of opioids, creating a public nuisance actionable under state law. *See* Kendrick, *supra,* at 738 n.198. Scholars have noted "several [federal] regulatory failures that contributed to the [opioid] crisis," precipitating remedial public interest actions by state attorneys general. *See id.* at 779 (quoting Nora Engstrom & Robert Rabin, *Pursuing Public Health Through Litigation*, 73 STAN. L. REV. 285, 304–05 (2021)).

Pharmaceutical industry defendants raised federal preemption defenses to opioid lawsuits in state and federal court, and although these defenses often failed, [8] the pharmaceutical companies prevailed at trial in some cases. *See, e.g.*, *California v. Purdue Pharma L.P.*, No. 30-2014-00725287 (Cal. Super. Ct. Orange Cnty. Nov. 1, 2021). In 2022, "three distributors entered a global settlement of approximately $26 billion with states" and "other [opioid manufacturer] defendants have announced plans for global settlements," providing significant funding to address the impact of opioids on communities across the United States. *See* Kendrick, *supra*, at 733.

**Climate Change Litigation.** State attorneys general and local governments have now brought public interest actions against energy industry defendants. Some of these actions involve claims alleging that energy industry defendants engaged in the production and deceptive marketing of energy products that they knew would accelerate climate change and its adverse impacts. [9]

*Rhode Island v. Shell Oil Products* provides a useful example. *See* 35 F.4th 44. In that case, "Rhode Island claim[ed] that [several defendant] Energy Companies ... knew for decades that burning fossil fuels is damaging the earth's atmosphere but duped the public into buying more and more of their products (consequences be damned)—all to line their very deep pockets." *Id.* at 49–50. The energy company defendants removed the case from Rhode Island state court to federal court, arguing in relevant part that the Clean Air Act "completely preempted" the state's claims, *id.* at 57, and that "Rhode Island's claims are 'bound up with,' 'implicate,' or 'seek[ ] to replace' various 'federal interests'— including energy policy, economic policy, environmental regulation, national security, and foreign affairs," *id.* at 56–57. After reviewing the claims before the court, the First Circuit rejected the energy industry defendants' "complete preemption" arguments and affirmed remand, allowing the case to proceed in state court. *See id.* at 62.

**\*6** In sum, the climate change action described in the Amended Complaint would potentially fall within a decades-long tradition of public interest litigation in which industry defendants have vigorously litigated federal preemption defenses raised in response to specific claims brought against specific entities under specific state laws in spaces heavily regulated by the federal government. The parties do not dispute that the federal government may move to intervene in such cases if necessary to protect "distinctly federal interests." *See Maryland v. Louisiana*, 451 U.S. 725, 728 (1981) ("We have often permitted the United States to intervene in appropriate cases where distinctively federal interests, best presented by the United States itself, are at stake.").

### 3. The *Alabama v. California* Emissions Litigation

In May 2024, several states sought to invoke the original jurisdiction of the United States Supreme Court by filing a Bill of Complaint to "[d]eclare attempts by [certain] Defendant States to impose liability for emissions by or in Plaintiff States unconstitutional and beyond the competence of Defendant States to prosecute" and "[e]njoin attempts by Defendant States to impose liability for emissions by or in Plaintiff States." *See* Mot., *Alabama v. California*, No. 158 (May 22, 2024), https://perma.cc/V65G-3TX2. The Court requested the position of the United States Solicitor General. The Solicitor General filed a brief arguing that the Court should deny the motion because, in relevant part, the plaintiff states litigating to protect private energy companies lacked Article III standing. *See* Sol. Gen.'s Br., *Alabama v. California*, No. 158 (Dec. 10, 2024), https://perma.cc/V65G-3TX2 (hereinafter "Sol. Gen.'s Br."). The Solicitor General explained:

> Private energy companies that produce coal, oil, and natural gas are defendants in numerous pending state-court suits brought by various States and local governments. Each

suit alleges a set of claims arising under the law of a particular State. Although the claims differ in various respects, including in their legal basis (statutory or common law) and the scope of relief requested, many of the claims seek to hold the companies liable for allegedly deceiving the public about the dangers of using their fossil-fuel products. *See, e.g., BP p.l.c. v. Mayor & City Council of Baltimore*, 593 U.S. 230, 234 (2021).

The suits that the plaintiff States challenge ... [were] filed by a different State in a different state court, alleging multiple different violations of that State's statutory or common law .... The plaintiff States ask this Court to enjoin, and declare unlawful, each of the state-court suits filed by the defendant States. In support of that request, the plaintiff States challenge the validity of the various state-law claims asserted in those suits ... [in relevant part] because the state law claims violate the Commerce Clause to the extent they seek to regulate extraterritorially."

Sol. Gen.'s Br. at 1–3 (cleaned up).

As relevant to Article III standing—which requires a plaintiff to allege a concrete, non-speculative injury fairly traceable to the conduct of a defendant—the "plaintiff States allege[d] that the defendant States [were] unlawfully 'attempt[ing] to use their laws and their courts to impose liability on traditional energy companies,' " which would increase energy costs and burden production in the plaintiff states. *See* Sol. Gen.'s Br. at 6; *see also id.* at 3–9. But, according to the Solicitor General, the theory of how these lawsuits could injure the plaintiff states depended on a long chain of "contingencies," including that: (1) certain state-law claims would succeed; (2) courts adjudicating the claims would reject the "private companies' defenses, including on the federal issues that the plaintiff States seek to raise here"; (3) any judgments entered on those specific state-law claims would survive appeal; and (4) the resulting judgments would increase the cost of energy. *See id.* "That chain of possibilities is too speculative and too attenuated to establish standing." *Id.* (citing *Food & Drug Admin. v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 380 (2024); *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013)). [10] Shortly after the Solicitor General filed this brief, the Supreme Court denied the plaintiff states' motion for a Bill of Complaint, effectively ending the action. *See Alabama v. California*, 145 S. Ct. 757 (2025).

### 4. Executive Order No. 14260—"Protecting American Energy from State Overreach"

**\*7** A few weeks after the United States Supreme Court denied the motion for a Bill of Complaint in *Alabama v. California*, the federal executive branch issued an executive order entitled "Protecting American Energy from State Overreach." *See* Exec. Order No. 14260, 90 Fed. Reg. 15513 (April 14, 2025). After reiterating many of the arguments raised by the state plaintiffs in *Alabama*, the executive order directed that the United States "Attorney General shall expeditiously take all appropriate action to stop the enforcement of State laws and continuation of civil actions" that burden the production and use of conventional "domestic energy resources." *See id*. The federal government filed this action sixteen days later.

### C. Procedural Posture

On April 30, 2025, the federal government filed a complaint seeking declaratory and injunctive relief against the Michigan Defendants (*see* ECF No. 1). The Michigan Defendants moved to dismiss for lack of subject-matter jurisdiction (ECF No. 6). On July 11, 2025, the federal government filed an Amended Complaint (ECF No. 8). The Michigan Defendants again moved to dismiss for lack of subject-matter jurisdiction (ECF No. 10), the federal government filed a response in opposition (ECF No. 19), and the Michigan Defendants filed a reply (ECF No. 20). The Court concludes, after reviewing these submissions, that oral argument is unnecessary to resolve the issues presented. *See* W.D. Mich. LCivR 7.2(d).

## II. ANALYSIS

### A. Motion Standard

Federal Rule of Civil Procedure 12(b)(1) authorizes the Court to dismiss a claim for relief in any pleading if the Court "lack[s] subject-matter jurisdiction." FED. R. CIV. P. 12(b)(1). The Sixth Circuit characterizes the dismissal of a case "for lack of standing" as a dismissal for lack of "subject matter jurisdiction" under Rule 12(b)(1). *See Kepley v. Lanz*, 715 F.3d 969, 972 (6th Cir. 2013). The "existence of federal jurisdiction" turns "on the facts as they exist when the complaint is filed." *See Lujan*, 504 U.S. at 571 n.4; *Smith,*

641 F.3d at 206 ("Standing to bring suit must be determined at the time the complaint is filed."). "Where subject matter jurisdiction is challenged pursuant to Rule 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the motion." *Moir v. Greater Cleveland Reg'l Transit Auth.*, 895 F.2d 266, 269 (6th Cir. 1990).

"In challenging a district court's subject-matter jurisdiction over a proceeding, a party may present a facial attack or a factual attack." *Polselli v. United States Dep't of the Treasury-IRS*, 23 F.4th 616, 621 (6th Cir. 2022), *aff'd sub nom. Polselli v. Internal Revenue Serv.*, 598 U.S. 432 (2023). In a facial attack, a "movant accepts the alleged jurisdictional facts as true and questions merely the sufficiency of the pleading to invoke federal jurisdiction." *Id.* The Court may also consider "any documents either attached to or incorporated in the complaint and matters of which [the court] may take judicial notice." *See N. Am. Butterfly Ass'n v. Wolf*, 977 F.3d 1244, 1249 (D.C. Cir. 2020) (collecting federal cases in the context of a Rule 12(b)(1) motion); *accord In re Temodar Consumer Class Action*, 678 F.3d 235, 243 (3d Cir. 2012) (same); *Carter v. HealthPort*, 822 F.3d 47, 56 (2d Cir. 2016) (same).

"In reviewing a facial attack to a complaint under Rule 12(b)(1) for lack of standing, we must accept the allegations set forth in the complaint as true while drawing all inferences in favor of the plaintiff, just as we do in reviewing a 12(b)(6) motion to dismiss for failure to state a claim." *See Hile v. Michigan*, 86 F.4th 269, 273 (6th Cir. 2023) (cleaned up).

### B. Discussion

**\*8** For the reasons stated below, the Court concludes that "[t]wo related doctrines of justiciability[,] each originating in the case-or-controversy requirement of Article III," defeat the federal government's arguments for subject-matter jurisdiction here. *See Trump v. New York*, 592 U.S. 125, 131 (2020). The Court will address both "ripeness" and "standing" below. *See id.*

### 1. This Case Is Not Ripe for Judicial Review

"The federal 'judicial Power' does not extend to any dispute that might arise," but only to "Cases and Controversies." *OverDrive Inc. v. Open E-Book Forum*, 986 F.3d 954, 957 (6th Cir. 2021) (citing U.S. Const. art. III, § 2). To establish that the present "dispute [is] appropriately resolved through the judicial process," the federal government must show that this case is "ripe" for judicial review. *Trump*, 592 U.S. at 131 (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998)). In making this determination, the Court asks two questions:

> One: Does the claim "arise in a concrete factual context and concern a dispute that is likely to come to pass?" A claim is not ripe if it turns on "contingent future events that may not occur as anticipated, or indeed may not occur at all." Two: What is "the hardship to the parties of withholding court consideration"?

*OverDrive Inc.*, 986 F.3d at 957–58 (cleaned up and emphasis added) (quoting *Trump,* 592 U.S. at 131; *Abbott Labs v. Gardner*, 387 U.S. 136, 149 (1967)). "[E]ven one negative answer creates a ripeness problem" divesting the Court of subject-matter jurisdiction." *Id.* (collecting cases). The federal government fails on both points.

*(a) This Dispute Turns on Contingent Future Events*

The Amended Complaint challenges a broad range of potential "state law claims" that may be brought against the "fossil fuel industry," and the federal government brought this challenge prior to the Michigan Defendants filing any "climate change lawsuit" (Am. Compl., ECF No. 8 at PageID.68, 70, 78). The Amended Complaint states that the Michigan Attorney General is "gathering needed information," "determining what claims [if any] will be brought," and analyzing whether "viable claims and causes of action" exist in connection with a range of "possible defendants," leaving open the possibility that the Michigan Defendants might not file "state law claims" that conform to the description provided in the Amended Complaint (*see id.* at PageID.69–70, 104–105). The federal government also indicates that the Michigan Defendants may properly bring (1) "federal claims related to their alleged harms" (*see* Opp., ECF No. 19 at PageID.197); or (2) state-law claims addressing the contributions of "in-state polluters" to "global emissions"—according to the federal government, neither of these categories of claims would "be preempted" (*see* Am. Compl., ECF No. 8 at PageID.80; Opp. ECF No. 19 at PageID.211).[11]

**\*9** Despite the foregoing admissions, the federal government also attempts to argue that "this case does not hinge on what exact theories of liability Michigan may bring" because "any state law claim that Michigan may assert based

on global greenhouse gas emissions would be preempted by federal law" (Opp., ECF No. 19 at PageID.200). After the Michigan Defendants listed several cases in which these types of state-law claims have survived federal preemption challenges (*see* Mot. Br., ECF No. 11 at PageID.152), the federal government fell back on the position that the Court must "accept as valid" its sweeping preemption "legal theory" in the context of the [Rule 12(b)(1)](#) motion at bar (*see* Opp., ECF No. 19 at PageID.200 & n.7). Given, however, that the Amended Complaint expressly states the Michigan Defendants may properly bring federal claims or certain state-law claims that address in-state contributors to global greenhouse gas emissions, the argument that this dispute does not "hinge" on the Michigan Defendants' potential "theories of liability" (*id.* at PageID.200), is "frivolous" on the face of the Amended Complaint. *See Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 89 (1998); *Stewart v. Martin*, 143 F.4th 675, 684 (6th Cir. 2025) (analyzing *Steel Co.* and noting "a plaintiff may lack standing when he presents" a legal theory "that is frivolous on its face," as where a "claimed injury" is not the "sort of interest that the law protects") (citing *Aurora Loan Servs. v. Craddieth*, 442 F.3d 1018, 1024 (7th Cir. 2006)); Am. Compl., ECF No. 8 at PageID.69–70, 104–105; Opp., ECF No. 19 at PageID.197, 211.[12] The federal government's admissions, as noted above, establish that this case does not arise "in a concrete factual context" and instead turns "on contingent future events[.]" *See OverDrive Inc.*, 986 F.3d at 957–58 (citing *Trump*, 592 U.S. at 131).

The federal government next analogizes this dispute to certain "pre-enforcement cases" that approve anticipatory challenges to statutes, rules, or regulations (*see* Opp., ECF No. 19 at PageID.203–204, citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014) (discussing conduct proscribed by a statute and a "credible threat" of that statute's enforcement); *Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 843 (6th Cir. 2024) (addressing a pre-enforcement challenge to conduct "proscribed by a statute")). But the federal government is not challenging a statute. The Michigan Defendants exhaustively demonstrate that "every case cited by the United States is readily distinguishable" because they involve "a concrete factual context" addressing the validity of extant laws, rules, regulations, ordinances, notices of intent to sue, published guidelines, or the like (*see* Reply, ECF No. 20 at PageID.231, collecting and distinguishing fourteen cases cited on this point by the federal government).

 *10  These "pre-enforcement" cases—far from supporting the federal government's position—prove the contrapositive and lead inescapably to the conclusion that this action is not ripe for judicial review. At the time the Amended Complaint was filed, the state-law claims the federal government sought to challenge did not exist (*see* Reply, ECF No. 20 at PageID.231). The federal government has failed to cite any case in which a court has preemptively enjoined a party from bringing a broad swath of unspecified claims against unspecified members of a given industry simply because that party has begun investigating whether a litigation strategy may have merit. *Cf.* Sol. Gen.'s Br. at 9 ("The [plaintiffs have] cited no precedent for finding standing in a case like this, in which the plaintiff's asserted injury is premised on the defendant's 'attempts to impose liability on' other parties in other suits."). The Court has identified no such precedent in reviewing the decades-long history of public interest lawsuits filed by state attorneys general against national industry groups in areas heavily regulated by the federal government. *See supra*, Section I.B.2.

*Trump v. New York* reinforces the Court's conclusion that this case is not ripe for review because it impermissibly turns on "contingent future events." *See* 592 U.S. at 131. In that case, several state plaintiffs brought a preemptive action challenging a presidential memorandum directing the Secretary of Commerce to "gather information" to the "maximum extent feasible and consistent with the discretion delegated to the executive branch" before issuing a report to assist the president in implementing "a policy of excluding from the [census] apportionment base aliens who are not in a lawful immigration status." *Id.* at 129–30. The Court concluded both that the case was not ripe and that the plaintiffs lacked Article III standing for these related reasons:

> [T]his case is riddled with contingencies and speculation that impede judicial review. The President, to be sure, has made clear his desire to exclude aliens without lawful status from the apportionment base. But the President qualified his directive by providing that the Secretary should gather information "to the extent practicable" and that aliens should be excluded "to the extent feasible." 85 Fed. Reg. 44680. Any prediction how the Executive Branch might eventually implement this general statement of policy is "no more than conjecture" at this time.
> 
> ....
> 
> The remedy crafted by the District Court underscores the contingent nature of the plaintiffs' injuries. Its injunction prohibits the Secretary from informing the President in his ... report of the number of aliens without lawful status ...

the injunction reveals that the source of any injury to the plaintiffs is the action that the Secretary or President *might* take in the future to exclude unspecified individuals from the apportionment base—not the policy itself "in the abstract."

*Id.* at 131 (cleaned up) (emphasis in original). The above reasoning applies with even greater force to the facts at bar. "Any prediction [of] how [the Michigan Defendants] might eventually implement" the statement of work directing their attorneys to explore the viability of legal claims against potential energy industry defendants was "no more than conjecture" at the time the Amended Complaint was filed. *See id.* And the "remedy crafted" by the federal government in this case similarly "underscores the contingent nature" of its asserted injuries. *See id.* The federal government's prayer for relief requests a declaration that the Michigan Defendants' "state law claims" are unconstitutional, but because the federal government sought an injunction before any such claims were filed, the Amended Complaint fails identify the specific nature or source of the claims it seeks to strike down (*see* Am. Compl., ECF No. 8 at PageID.70, 92).

In sum, the federal government fails to establish that this dispute is ripe because the Amended Complaint turns "on contingent future events that may not occur as anticipated, or indeed may not occur at all." *See Trump*, 592 U.S. at 131; *accord OverDrive Inc.*, 986 F.3d at 958 (concluding that a company's copyright infringement action was not ripe because it depended on "contingent future events"); *Saginaw County v. STAT Emergency Medical Services, Inc.*, 946 F.3d 951, 953 (6th Cir. 2020) ("Because federal courts have the power to tell parties what the law is, not what it might be in a potential enforcement action by the government, no jurisdiction exists."); *Doe v. Univ. of Mich.*, 78 F.4th 929, 950 (6th Cir. 2023) (concluding that a claim was not "ripe for adjudication" because the "potential outcome to which [plaintiff] objected depended on a number of [future] factors"); *Baaghil v. Miller*, 1 F.4th 427, 435 (6th Cir. 2021) (concluding certain claims were not ripe in part because they depended on future government conduct).

*(b) A Hardship Analysis Further Establishes That This Case Is Not Ripe for Review*

**\*11** The federal government also fails to carry its burden on the second ripeness question: it cannot show that "deferring review impose[s] hardship." *See New Heights Farm*, 119 F.4th 455, 460 (6th Cir. 2024) (cleaned up). The Amended Complaint fails to establish any "significant practical harm" that the federal government would suffer from waiting to determine: (1) whether the Michigan Defendants assert the state-law claims that the federal government contends are preempted; and (2) whether the federal government should intervene to vindicate "distinctly federal interests." *See Maryland*, 451 U.S. at 728; *OverDrive Inc.*, 986 F.3d at 958 (concluding that a plaintiff's failure to show a "current" violation indicates its "theory of prejudice is just as unripe as everything else in this claim"); *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 734 (1998) (concluding that a case was not ripe in part because the plaintiff would "have ample opportunity later to bring its legal challenge at a time when harm is more imminent and more certain," resulting in "no significant practical harm").

The federal government's hardship arguments fail for several reasons (*compare* Opp., ECF No. 19 at PageID.211–217 *with* Reply, ECF No. 20 at PageID.235–240). First, the federal government argues that the threat of a lawsuit by the Michigan Defendants undermines "federal sovereignty" and its ability to "speak with one voice" on foreign affairs (*see* Opp., ECF No. 19 at 213–217, citing inapposite trial court orders addressing "irreparably injury" in the context of preliminary injunction motions). But the United States Supreme Court has stated that such "abstraction[s]" are "inadequate to support" a finding of hardship in affirming the dismissal of an action that was "not ripe for adjudication." *See Texas v. United States*, 523 U.S. 296, 302 (1998) (rejecting an argument that a state suffered "the immediate hardship of a 'threat to federalism.' ").

Second, the federal government argues that deferring review would give rise to "legal uncertainty" (*see* Opp., ECF No. 19 at PageID.211–217). But "mere uncertainty as to the validity of a legal rule" does not amount to "real hardship" for purposes of ripeness. *See Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 811–12 (2003); *cf. Airline Pros. Ass'n of Int'l Bhd. of Teamsters, Loc. Union No. 1224, AFL-CIO v. Airborne, Inc.*, 332 F.3d 983, 988 (6th Cir. 2003) (noting overlap between standing and ripeness and stating that a plaintiff must "allege more" than "abstract uncertainty" about a legal question to establish standing); *see also* Reply, ECF No. 20 at PageID.236–237 (distinguishing several inapposite cases cited by the federal government).

Third, the federal government presents no binding or applicable authority indicating that "it is [exempt as a

sovereign] from the normal rules of justiciability and does not need to prove that it is altering its primary conduct to show hardship" (*compare* Reply, ECF No. 20 at PageID.237 *with* Opp., ECF No. 19 at 216–217). The Michigan Defendants identify authority to the contrary. *See Texas v. United States*, 523 U.S. at 302 (concluding a sovereign state cannot show hardship unless its "primary conduct is affected"); *United States v. West Virginia*, 295 U.S. 463, 473–75 (1935) (dismissing an action filed by the federal government on justiciability grounds); *cf.* Sol. Gen.'s Br. at 8–9 (distinguishing cases based on injury to "sovereign" interests).

The Court concludes that deferring review will not "impose significant practical harm" on the federal government. *Ohio Forestry Ass'n, Inc.*, 523 U.S. at 734. This conclusion is a separate, independently sufficient reason to grant the Michigan Defendants' motion to dismiss for lack of subject-matter jurisdiction. *See Trump*, 592 U.S. at 134; *OverDrive Inc.*, 986 F.3d at 958.

### 2. No Standing Due to the Lack of a Concrete or Fairly Traceable Injury

This dispute is not fit for judicial review for an additional reason: the federal government lacks standing.[13] Standing is a "doctrine of justiciability" that originates from the same "case-or-controversy requirement of Article III" that gives rise to the ripeness doctrine discussed above. *See Trump*, 592 U.S. at 131. "The fundamentals of standing are well-known and firmly rooted in American constitutional law. To establish standing ... a plaintiff must demonstrate (i) that [the plaintiff] has suffered or likely will suffer an injury in fact, (ii) that the injury likely was caused or will be caused by the defendant, and (iii) that the injury likely would be redressed by the requested judicial relief." *Alliance for Hippocratic Med.*, 602 U.S. at 380. For the below reasons, the federal government has failed to show an "imminent rather than conjectural or hypothetical" injury causally connected and fairly traceable to the Michigan Defendants. *See Trump*, 592 U.S. at 131.

#### (a) The Federal Government's Asserted Injuries are Conjectural and Hypothetical

**\*12** The federal government has not met its burden of identifying "an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical." *Trump*, 592 U.S. at 131; *see also Alliance for Hippocratic Med.*, 602 U.S. at 381 ("[W]hen a plaintiff seeks prospective relief such as an injunction, the plaintiff must establish a sufficient likelihood of future injury."). This injury requirement "screens out plaintiffs who might have only a general legal, moral, ideological, or policy objection to a particular government action," or, as here, objections to a government course of action merely under consideration. *Alliance for Hippocratic Med.*, 602 U.S. at 381.

In *Trump v. New York*, the Supreme Court clarified that the standing requirement of an "imminent rather than conjectural or hypothetical" injury and the ripeness requirement precluding "contingent" disputes "are related doctrines." *See Trump*, 592 U.S. at 131. *Trump* suggested that courts may properly analyze these requirements together in a case involving a preemptive challenge to "the threatened impact" of a government course of action. *Id.*; *see also Winter v. Wolnitzek*, 834 F.3d 681, 687 (6th Cir. 2016) (citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157 n.5 (2014)) ("The doctrines of standing and ripeness originate from the same Article III limitation and thus are analyzed together" in certain cases). Given this guidance, the Court concludes the federal government has failed to establish "an injury that is concrete, particularized, and imminent rather than conjectural or hypothetical" for the same reasons that this dispute impermissibly turns on "contingent future events," as discussed in detail above. *See Trump*, 592 U.S. at 131; *Alliance for Hippocratic Medicine*, 602 U.S. at 390; *Clapper*, 568 U.S. at 414.

*Sherwin-Williams* provides additional support for the Court's conclusion. *See* 968 F.3d at 266. The "Sherwin-Williams Company sued several Pennsylvania counties to forestall lead-paint litigation those counties *seemed poised to file*." *Id.* (emphasis added). The district court dismissed the action "for lack of Article III standing." *Id.* The Third Circuit affirmed, reasoning as follows:

> Sherwin-Williams ... claims it sufficiently alleged an imminent injury ... based on a potential lawsuit by the County. But even if it could show that a *lawsuit* were certainly impending, it did not establish that such a lawsuit would cause a concrete *injury* to its constitutional rights. The company's constitutional claims ... rest on what it anticipates the County might allege in a hypothetical lawsuit. Such speculation cannot satisfy Article III's standing requirements. *See Aetna*, 300 U.S. at 241 (explaining federal courts may not issue "opinion[s]

advising what the law would be upon a hypothetical state of facts").

Sherwin-Williams asks us to assume not only that the County will sue, but also its theory of liability, its litigation tactics, and that the County will prevail. The County may proceed as Sherwin-Williams predicts. Or it may not. And who knows whether the County would win? That uncertainty—and all of the contingencies that go along with it—expose Sherwin-Williams's inability to allege an existing injury or one that is "certainly impending." *See* Whitmore, 495 U.S. at 155, 158.

Sherwin-Williams, 968 F.3d at 270 (cleaned up and emphasis in original).

The Third Circuit's reasoning applies squarely to the facts before the Court here. The Amended Complaint turns "on what [the federal government] anticipates" the Michigan Defendants "might allege" in court at a later date, based in part on speculation about prior lawsuits filed by outside counsel. *Id.* at 267, 270. [14] The federal government asks the Court to "assume not only that the [Michigan Defendants] will sue, but also [their] theory of liability, [their] litigation tactics," and that they will prevail. *See id.* "That uncertainty—and all of the contingencies that go along with it—expose" the federal government's inability to "allege an existing injury or one that is certainly impending" here. *Id.* At bottom, the federal government has failed to establish an injury sufficient to support standing. *See id.;* Trump, 592 U.S. at 131.

*(b) No Causal Connection to an Injury
Fairly Traceable to the Michigan Defendants*

**\*13** Additionally, the federal government has the burden of showing "a causal connection between the injury and the conduct complained of—the injury has to be fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court." Lujan v. Defs. of Wildlife, 504 U.S. 555, 560 (1992) (cleaned up). "The causation requirement is central to Article III standing" because without "the causation requirement, courts would be virtually continuing monitors of the wisdom and soundness of government action." Alliance for Hippocratic Med., 602 U.S. at 383.

As relevant to the causation requirement, the federal government alleges that the "imminent prospect of Michigan's litigation threatens a concrete injury to the sovereign interests of the United States" because "the United States endures harm to its national energy policy so long as fossil fuel companies face a prospective chaotic patchwork of conflicting requirements from states and local governments" (*see* Am. Compl., ECF No. 8 at PageID.72–73). "[R]egardless of the exact theories of liability that Michigan employs, its goals are clear—to extract large sums of money from fossil fuel companies for purportedly causing climate change impacts to Michigan" (*id.*). The federal government asserts that any state-law claims brought by the Michigan Defendants against any energy industry defendants will "increase the United States' costs for purchasing fuels and threaten revenue from federal leasing," "impose substantial burdens" on interstate and foreign commerce, and "complicate ... relations with foreign countries" (*id.* at PageID.82, 88, 86, 90).

This theory of injury rests on a "highly attenuated chain of possibilities," *see* Clapper v. Amnesty Int'l USA, 568 U.S. 398, 410 (2013), even more tortuous and speculative than the one criticized by the United States Solicitor General in *Alabama v. California*. *See* Sol. Gen.'s Br. at 6; Alabama, 145 S. Ct. at 757. The injuries set forth in the Amended Complaint depend on the following events occurring exactly as the federal government predicts: (1) the Michigan Defendants must allege state-law claims in court rather than the federal claims acceptable to the federal government; (2) the state-law claims must fail to invoke the "reservoir of state common law" acceptable to the federal government; (3) the state-law claims must be preempted by federal law; (4) the Michigan Defendants must defeat any federal preemption defenses raised by energy industry defendants in court; (5) the Michigan Defendants must win their lawsuit; (6) they must successfully defend any judgment entered in their favor on appeal; and 7) the judgment must effect a result so significant that it impacts federal energy policy, federal leasing revenues, [15] the domestic cost of energy, and the federal government's relations with foreign countries (*see* Am. Compl., ECF No. 8 at PageID.82, 88, 86, 90; Opp., ECF No. 19 at PageID.189–192). [16]

**\*14** The Court concludes, based on applicable Supreme Court precedent, that this chain of possibilities is too speculative and attenuated to establish an injury fairly traceable to the Michigan Defendants. *See* Alliance for Hippocratic Medicine, 602 U.S. at 385, 390 (noting that plaintiffs failed to "show a predictable chain of events leading from the [challenged] action to the asserted injury" given

breaks in "any chain of causation"); *Clapper*, 568 U.S. at 410 (rejecting a "theory of standing, which relies on a highly attenuated chain of possibilities"); *California v. Texas*, 593 U.S. at 678 (rejecting arguments for Article III standing based on a "highly attenuated chain of possibilities"); *see also Trump,* 592 U.S. at 133 (stating that plaintiffs' "prediction[s] about future injury [and its effects are] just that—a prediction" insufficient to establish Article III standing).

The federal government has failed to carry its burden on subject-matter jurisdiction for the independently sufficient reasons that its alleged injuries are "conjectural or hypothetical," *see Trump,* 592 U.S. at 131, and lack "a causal connection between the [alleged] injury and the conduct complained of" sufficient to establish that "the injury [is] fairly traceable to the challenged action of the defendant," *see Lujan,* 504 U.S. at 560 (cleaned up).

### III. CONCLUSION

For the foregoing reasons:

**IT IS HEREBY ORDERED** that Defendants' Motion to Dismiss for Lack of Subject Matter Jurisdiction (ECF No. 10) is GRANTED and this matter is DISMISSED.

Because this Opinion and Order resolves all pending claims, the Court will also enter a Judgment to close this case. *See* FED. R. CIV. P. 58.

**All Citations**

--- F.Supp.3d ----, 2026 WL 194031

---

**Footnotes**

1   The federal government filed its operative Amended Complaint prior to the Michigan Defendants initiating a "climate change lawsuit." The "existence of federal jurisdiction" turns on "the facts as they exist when the complaint is filed," not on subsequent events. *See Lujan v. Defs. of Wildlife,* 504 U.S. 555, 571 n.4 (1992); *accord Smith v. Jeff. Cnty. Bd. of Sch. Comm'rs,* 641 F.3d 197, 206 (6th Cir. 2011) ("Standing to bring suit must be determined at the time the complaint is filed.").

2   This factual background section draws from the allegations set forth in the federal government's Amended Complaint (ECF No. 8) given the Michigan Defendants' "facial attack" on subject-matter jurisdiction. *See Polselli v. United States Dep't of the Treasury-IRS,* 23 F.4th 616, 621 (6th Cir. 2022), *aff'd sub nom. Polselli v. Internal Rev. Serv.,* 598 U.S. 432 (2023) (noting that in raising a facial attack under FED. R. CIV. P. 12(b)(1), a "movant accepts the alleged jurisdictional facts as true and questions merely the sufficiency of the pleading to invoke federal jurisdiction."). The Court may also consider "documents either attached to or incorporated in the complaint and matters of which [the Court] may take judicial notice." *See N. Am. Butterfly Ass'n v. Wolf,* 977 F.3d 1244, 1249 (D.C. Cir. 2020) (collecting cases in the context of a Rule 12(b)(1) motion).

3   "This feature of most state attorneys general resonates strongly with federalism's concern for democratic accountability ... part of the virtue of decentralized government power is that it increases the responsiveness of government to localized priorities." Morrison, *supra*, at 6.

4   *See* Deborah Jones Merritt, *The Guarantee Clause and State Autonomy,* 88 COLUM. L. REV. 1, 7–8 (1988) ("[Groups that lack representation] on the federal level can maintain their constituencies in the states," and the "greater accessibility and smaller scale of local government allows individuals to participate actively in governmental decisionmaking. This participation, in turn, provides myriad benefits: it trains citizens in the techniques of democracy, fosters accountability among elected representatives, and enhances voter confidence in the democratic process."); Heather K. Gerken, *The Loyal Opposition,* 123 YALE L.J. 1958, 1959 (2014) (noting that the Anglo-American tradition of "loyal opposition" has been called "the greatest

contribution of the nineteenth century to the art of government, [and] is a stand-in for some of the best practices in democracy: making space for dissent [and] knitting outsiders into democracy's fabric[.]").

5   *See* Federal Preemption - State Attorney General Power, 120 HARV. L. REV. 627, 630 (2006) (citing *D.J. Morrow, Transporting Lawsuits Across State Lines*, N.Y. TIMES, Nov. 9, 1997 at 16.).

6   *See, e.g., In re Mid-Atlantic Toyota Antitrust Litigation*, 516 F. Supp. 1287 (D. Md. 1981), *aff'd in part sub nom. Pennsylvania v. Mid-Atl. Toyota Distribs., Inc.*, 704 F.2d 125, 129-30 (4th Cir. 1983); *Hawaii v. Standard Oil Co.*, 405 U.S. 251 (1972); *Shevin v. Exxon Corp.*, 526 F.2d 266 (5th Cir. 1976); *In re Multidistrict Motor Vehicle Air Pollution Control Litig.*, 481 F.2d 122 (9th Cir. 1973); *Illinois v. Bristol-Myers Co.*, 470 F.2d 1276 (D.C. Cir. 1972); *West Virginia v. Chas. Pfizer & Co.*, 440 F.2d 1079 (2d Cir. 1971); *Illinois v. Associated Milk Producers, Inc.*, 351 F. Supp. 436 (N.D. Ill. 1972); *Derryberry v. Kerr-McGee Corp.*, 516 P.2d 813 (Okla. 1973).

7   *See, e,g., In re Mid-Atl. Toyota Antitrust Litig.*, 585 F. Supp. at 1557-58 (D. Md. 1984) (noting that some defendants agreed to an injunction against price-fixing); *In re Mid-Atl. Toyota Antitrust Litig.*, 564 F. Supp. 1379, 1382 (D. Md. 1983) (granting consumers financial relief).

8   *See, e.g., City & Cnty. of San Francisco v. Purdue,* 491 F. Supp. 3d 610, 661–62 (N.D. Cal. 2020) (rejecting several arguments suggesting that "federal law preempts" the state-law claims at issue by operation of the federal Controlled Substances Act and Food, Drug, and Cosmetic Act).

9   *See, e.g., Rhode Island v. Shell Oil Prods. Co., L.L.C.*, 35 F.4th 44 (1st Cir. 2022); *City of Hoboken v. Chevron Corp.*, 45 F.4th 699 (3d Cir. 2022); *Mayor & City Council of Balt. v. BP P.L.C.*, 31 F.4th 178 (4th Cir. 2022); *County of San Mateo v. Chevron Corp.*, 32 F.4th 733 (9th Cir. 2022); *Board of County Comm'rs of Boulder County v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238 (10th Cir. 2022); *City of New York v. Chevron Corp.*, 993 F.3d 81 (2d Cir. 2021).

10  The United States Solicitor General also noted that "the plaintiff States provide no explanation why, if the federal issues they seek to raise here are meritorious and worthy of this Court's attention (as they contend), and if those federal issues would prove to be dispositive of the state court litigation, the Court would not simply grant certiorari to review such a final judgment against the private companies." *See* Sol. Gen.'s Br. at 7 (citing 28 U.S.C. 1257(a)).

11  But—the federal government argues—the Michigan Defendants had not "identif[ied] any [specific] federal or source-state claims" that they planned to pursue as of the time the Amended Complaint was filed (*see* Opp., ECF No. 119 at PageID.211). True. The Amended Complaint alleged that the Michigan Defendants were simply investigating potential litigation strategies. The federal government is the party that filed this preemptive lawsuit. The federal government is the party seeking a declaration that a broad category of theoretical "state law claims [are] unconstitutional" (*see* Am. Compl., ECF No. 8 at PageID.70, 92). The federal government bears the burden of establishing subject-matter jurisdiction, not the Michigan Defendants. *See Moir*, 895 F.2d at 269. The federal government, not the Michigan Defendants, must show that this dispute arises in "a concrete factual context[,] concern[s] a dispute that is likely to come to pass," and does not turn "on contingent future events that may not occur as anticipated, or indeed may not occur at all." *See OverDrive Inc.,* 986 F.3d at 958 (citing *Trump,* 592 U.S. at 131).

12  The cases that the federal government cites for the proposition that the Court must accept its preemption "legal theory" note a basic difference between motions to dismiss under Rule 12(b)(6) and Rule 12(b)(1). *Tanner-Brown v. Haaland,* 105 F.4th 437, 445 n.2 (D.C. Cir. 2024) (quoting *Steel Co.,* 523 U.S. at 89) ("[T]he absence of a valid (as opposed to arguable) cause of action does not implicate subject matter jurisdiction ... the district court has jurisdiction if the right of the petitioners to recover under their complaint will be sustained if [laws are] given one construction and will be defeated if they are given another, unless the claim clearly

appears to be immaterial and made solely for the purpose of obtaining jurisdiction or where such a claim is wholly insubstantial and frivolous."); *see also* Wright, Miller & Cooper, 5B Fed. Prac. & Proc. Civ. § 1350 (4th ed.)); *Stewart*, 143 F.4th at 684; *Aurora*, 442 F.3d at 1024.

Here, not only has the federal government failed to provide authority establishing that "any state law claim that Michigan may assert based on global greenhouse gas emissions would be preempted by federal law" (Opp., ECF No. 19 at PageID.200), the Amended Complaint and the federal government's briefing admit that the Michigan Defendants may properly file federal claims or certain state-law claims (*see* Am. Compl., ECF No. 8 at PageID.69–70, 80, 104–105; Opp., ECF No. 19 at PageID.197, 211). The Court concludes that the federal government's legal theory that this case does not "hinge" on the Michigan Defendants' potential "theories of liability" (Opp., ECF No. 19 at PageID.200), is thus "frivolous" on the face of the Amended Complaint given the federal government's express allegations and admissions to the contrary. *See Steel Co.,* 523 U.S. at 89; *Stewart*, 143 F.4th at 684; *Aurora*, 442 F.3d at 1024.

13   The federal government argues in passing, without citation to authority, that the Michigan Defendants "forfeited all" arguments aside from ripeness in their motion to dismiss for lack of subject-matter jurisdiction. This argument fails because the "district court may sua sponte consider its subject matter jurisdiction." *See Franzel v. Kerr Mfg. Co.,* 959 F.2d 628, 630 (6th Cir.1992).

14   The Third Circuit expressly rejected the plaintiff's invitation to speculate about the local government defendants' potential litigation strategy based on prior lawsuits that had been filed by their outside counsel. *Sherwin-Williams,* 968 F.3d at 267, 272. Additionally, the court distinguished "pre-enforcement" case law that "found Article III standing" in cases that involved concrete challenges to a specific federal statute, concluding that "Sherwin-Williams's claims are not ripe largely for the same reasons they fail to satisfy the injury-in-fact requirement—they require speculation about whether the County will sue and what claims it would raise." *Id.* at 272.

15   Federal appellate courts have rejected arguments raised by energy industry defendants attempting to remove climate change lawsuits to federal court based on speculation that judgments in those suits might impair federal leasing programs. *See, e.g., Bd. of Cty. Comm'rs of Boulder Cty. v. Suncor Energy (U.S.A.) Inc.*, 25 F.4th 1238, 1275 (10th Cir. 2022) (affirming the district court's remand order for lack of federal jurisdiction and noting "it is difficult to see how such a prospective theory of negative economic incentives—flowing from a lawsuit that does not directly attack ... exploration, resource development, or leases—is anything other than contingent and speculative."); *Rhode Island v. Shell Oil Products Co.*, 35 F.4th 44, 60 (1st Cir. 2022) (same).

16   A determination of whether state-law claims brought by the Michigan Defendants would (1) cause energy producers to increase the cost of oil or natural gas and burden commerce, (2) necessitate that federal agencies change national energy policy, or (3) affect foreign policy "require[s] guesswork as to how independent decisionmakers will exercise their judgment," and the Supreme Court has expressed reluctance to endorse such "standing theories." *See Clapper,* 568 U.S. at 413; *see also Whitmore v. Arkansas,* 495 U.S. 149, 155–56 (1990) (concluding that an alleged injury was too attenuated because "[i]t is just not possible for a litigant to prove in advance that the judicial system will lead to any particular result in his case").

---

**End of Document**                                © 2026 Thomson Reuters. No claim to original U.S. Government Works.