ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
JUSTIN D. HEMINGER
*Acting Deputy Assistant Attorney General* (D.C. Bar No. 974809)
United States Department of Justice
Environment and Natural Resources Division
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 598-5396
Email: justin.heminger@usdoj.gov

Attorneys for Plaintiff United States of America

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| UNITED STATES OF AMERICA, | No. 1:25-cv-00179-HG-WRP |
| *Plaintiff*, | |
| v. | **PLAINTIFF UNITED STATES' MOTION TO ALTER OR AMEND THE JUDGMENT** |
| STATE OF HAWAII; JOSHUA BOOTH GREEN, Governor of Hawaii, in his official capacity; and ANNE E. LOPEZ, in her official capacity as Hawaii Attorney General, | Judge: Hon. Helen Gillmor |
| *Defendants*. | |

**TABLE OF CONTENTS**

TABLE OF AUTHORITIES ........................................................................ ii

INTRODUCTION ....................................................................................1

BACKGROUND .....................................................................................2

LEGAL STANDARD...............................................................................4

ARGUMENT ..........................................................................................4

I.      The Court should grant the United States leave to file a
        supplemental complaint.................................................................4

II.     The Court alternatively should correct a manifest error by
        altering the final judgment to be a dismissal *without* prejudice......................9

CONCLUSION ......................................................................................10

CERTIFICATE OF COMPLIANCE.................................................................12

EXHIBIT A:    Declaration of EPA Assistant Administrator Aaron Szabo in Sup-
              port of the United States' Motion for a Preliminary Injunction, Dkt.
              13, *United States v. Minnesota*, 26-cv-02456-SRN-DLM (D. Minn.
              May 11, 2026)

EXHIBIT B:    Declaration of Christopher Landau, Deputy Secretary of State of
              the United States of America, Dkt. 12, *United States v. Minnesota*,
              26-cv-02456-SRN-DLM (D. Minn. May 11, 2026)

# TABLE OF AUTHORITIES

## Cases

*Barke v. Banks*, 25 F.4th 714 (9th Cir. 2022) ......................................................5, 9

*Federal Election Comm'n v. Cruz*,
    596 U.S. 289 (2022)................................................................................8

*Foothills Christian Ministries v. Johnson*,
    148 F.4th 1040 (9th Cir. 2025) ...............................................................9

*Hampton v. Pacific Investment Mgmt. Co. LLC*,
    869 F.3d 844 (9th Cir. 2017) ..................................................................9

*Missouri ex rel. Koster v. Harris*,
    847 F.3d 646 (9th Cir. 2017) ..........................................................6, 7, 9

*Northstar Financial Advisors Inc. v. Schwab Investments*,
    779 F.3d 1036 (9th Cir. 2015) ................................................................8

*Thinket Ink Info Res., Inc. v. Sun Microsystems, Inc.*,
    368 F.3d 1053 (9th Cir. 2004) ................................................................6

*Turner v. Burlington N. Santa Fe R. Co.*,
    338 F.3d 1058 (9th Cir. 2003) ................................................................4

## Court Rules and Other Authority

Fed. R. Civ. P. 15(a)..............................................................................................5, 8

Fed. R. Civ. P. 15(d) ............................................................................................5, 8

Fed. R. Civ. P. 59(e)...............................................................................................4

Wright, Miller, & Kane, Federal Practice and Procedure: Civil 3d
    § 1505 ....................................................................................................8

**INTRODUCTION**

The Court should alter or amend final judgment in this case for two reasons. *First*, the final judgment deprived the United States of a fair opportunity to correct its complaint to address the jurisdictional deficiency identified by the Court. And the Court's stated reason for denying such leave appears to rest on the United States' apparent misunderstanding about a supplemental question from the Court. When the Court asked about leave to amend, the United States answered based on the circumstances at that time, *before* the Court provided its reasoning in support of dismissing the complaint. The United States would have answered differently if it understood the question to be whether the United States would seek leave to amend or supplement its complaint if the Court were to dismiss for lack of standing. And here, a supplemental pleading would be the appropriate procedural mechanism for the United States to respond to the Court's dismissal decision.

*Second*, at a bare minimum, the final judgment should be amended to correct a reversible error. Under Ninth Circuit precedent, a complaint dismissed for lack of subject matter jurisdiction should be dismissed *without* prejudice. The final judgment departed from that rule by dismissing the United States' complaint *with* prejudice. Though it would be more efficient to allow a supplemental complaint, the Court should at least alter the final judgment to be a dismissal *without* prejudice. Dismissal

without prejudice will allow the United States to initiate a new lawsuit with a revised complaint further supporting its standing.

In sum, the Court should amend the final judgment to grant the United States leave to file a supplemental complaint against Hawaii that addresses the Court's reasons for dismissal. But if the Court declines that request, the Court should alter the final judgment to dismiss the case without prejudice.

Under Local Rule 7.8, this Motion is made after the conference of counsel on May 5, 2026. Counsel were unable to reach a resolution that would obviate the need for this Motion, and counsel for the United States understands that Hawaii opposes the requested relief.

## BACKGROUND

On April 30, 2025, the United States sued Hawaii. Compl. ¶ 7, ECF 1. The United States alleged that its sovereign, proprietary, and parens patriae interests were injured by Hawaii's anticipated state court claims against energy companies. *Id*. ¶¶ 7, 15-17, 28-40. The United States asserted claims under the U.S. Constitution and the Clean Air Act. *Id*. ¶¶ 28-88. The next day, Hawaii filed the State Court Action. ECF 22-2. Then in this case, Hawaii filed its Answer, ECF 19, and moved for judgment on the pleadings. ECF 22.

The United States requested a hearing on Hawaii's motion, which the Court scheduled for January 27, 2026. ECF 35. But on January 22, 2026, five days before

2

the scheduled hearing, the Court canceled it and directed the parties to address five supplemental questions. ECF 39.

One of those questions was, "Is The Plaintiff United States of America Seeking Leave to Amend The April 30, 2025 Complaint?" *Id*. at 1. The Court further directed that the United States "shall address the question of leave to amend the Complaint or why it believes amendment is not necessary to address the issues raised in the Defendants' Motion for Judgment on the Pleadings." *Id*. at 2. The United States responded to that question by asserting that no amendment to the complaint was necessary because the complaint adequately alleged standing. ECF 40 at 1-5.

Then the Court dismissed the complaint with prejudice for lack of standing. ECF 43. Though recognizing that a district court "generally affords a plaintiff leave to amend when a defendant successfully challenges a plaintiff's standing at the pleading stage," the Court stated that the United States had "declined [] the opportunity to amend its Complaint," so "[t]here is no basis to provide [the United States] with another opportunity for leave to amend." *Id*. at 27 (citations omitted). The final judgment did not grant the United States leave to amend or to file a supplemental complaint.

3

## LEGAL STANDARD

Federal Rule of Civil Procedure 59(e) grants the Court "considerable discretion" when considering a motion to alter or amend a judgment. *Turner v. Burlington N. Santa Fe R. Co.*, 338 F.3d 1058, 1063 (9th Cir. 2003). There are four grounds upon which a Rule 59(e) motion may be granted: (1) the motion is "necessary to correct manifest errors of law or fact upon which the judgment is based"; (2) the moving party presents "newly discovered or previously unavailable evidence"; (3) the motion is necessary to "prevent manifest injustice;" or (4) there is an "intervening change in controlling law." *Id.* (cleaned up). A Rule 59(e) motion must be filed "within 28 days." Fed. R. Civ. P. 59(e).

## ARGUMENT

The Court should amend the final judgment to grant the United States leave to file a supplemental complaint that cures the standing defect identified by the Court. Alternatively, the Court should alter the final judgment to correct a manifest error of law because any dismissal of the complaint should have been *without* prejudice.

**I.     The Court should grant the United States leave to file a supplemental complaint.**

The Court should amend the final judgment to grant the United States leave to file a supplemental complaint. Though in most cases, the Court should liberally

4

grant leave to amend the complaint under Rule 15(a), the better course here is to grant leave to supplement under Rule 15(d).

Under Rule 15(a), it is "black-letter law that a district court must give plaintiffs at least one chance to amend a deficient complaint," although that presumption can be overcome where there has been a "clear showing that amendment would be futile." *Barke v. Banks*, 25 F.4th 714, 721 (9th Cir. 2022) (cleaned up). This Court recognized this rule when it observed that a district court "generally affords a plaintiff leave to amend when a defendant successfully challenges a plaintiff's standing at the pleading stage." ECF 43 at 27. Likewise, Rule 15(d) authorizes the Court, on "motion and reasonable notice" and "just terms," to permit a party to serve a supplemental pleading "setting out any transaction, occurrence, or event that happened after the date of the pleading to be supplemented." Fed. R. Civ. P. 15(d).

The Court's denial of leave to amend appears to be based on the United States' misunderstanding of the Court's supplemental question. The supplemental question was: "Is The Plaintiff United States of America Seeking Leave to Amend The April 30, 2025 Complaint?" Minute Order, ECF 39 at 1. The Court further directed that the United States "shall address the question of leave to amend the Complaint or why it believes amendment is not necessary to address the issues raised in the Defendants' Motion for Judgment on the Pleadings." *Id.* at 2. The United States re-

5

sponded to that question by asserting that no amendment to the complaint was necessary because the complaint adequately alleged standing. ECF 40 at 1-5. The United States answered the question based on its understanding that the Court had not yet decided whether to dismiss the complaint, much less the basis on which it would dismiss the complaint.

The dismissal decision states that the United States "declined [] the opportunity to amend its Complaint." ECF 43 at 27. But the United States had explained that amendment was not necessary, and it did so because the Court had not ruled on Hawaii's motion for judgment on the pleadings. By contrast, if the Court's supplemental question had been, "Does the United States intend to seek leave to amend if the Court dismisses the complaint for lack of standing," the answer from the United States would have been, "Yes."

The Ninth Circuit has held that a dismissal without leave to amend is "improper unless it is clear, upon *de novo* review, that the complaint could not be saved by any amendment." *Thinket Ink Info Res., Inc. v. Sun Microsystems, Inc.*, 368 F.3d 1053, 1061 (9th Cir. 2004). Thus, a district court "does not err in denying leave to amend where the amendment would be futile." *Missouri*, *Missouri ex rel. Koster v. Harris*, 847 F.3d 646, 656 (9th Cir. 2017). But the decision here did not refuse leave to amend on futility grounds. The only reason given was that the United States had

declined the opportunity to amend its complaint—which, again, stems from the United States' apparent misunderstanding of the Court's question.

Nor would amendment be futile. The United States is prepared to file a revised complaint that articulates in greater detail the specific injuries caused by Hawaii's State Action. To that end, the United States recently sought a preliminary injunction in a case against Minnesota in which it introduced evidence of harm to the United States caused by a lawsuit like Hawaii's State Action. *See* Ex. A, Declaration of EPA Assistant Administrator Aaron Szabo in Support of the United States' Motion for a Preliminary Injunction, Dkt. 13, *United States v. Minnesota*, 26-cv-02456-SRN-DLM (D. Minn. May 11, 2026) (Szabo Decl.) (identifying harms to EPA caused by Minnesota's lawsuit against energy companies); Ex. B, Declaration of Christopher Landau, Deputy Secretary of State of the United States of America, Dkt. 12, *United States v. Minnesota*, 26-cv-02456-SRN-DLM (D. Minn. May 11, 2026) (Landau Decl.) (identifying harms to United States' foreign policy caused by Minnesota's lawsuit against energy companies). So here, the United States can plead allegations more detailed than those in the complaint to flesh out the harms caused by Hawaii's State Action.

To be sure, Hawaii may object that amendment would still be futile because the United States filed its complaint the day *before* Hawaii filed the State Action, and standing is measured at the time the complaint is filed. *See Missouri*, 847 F.3d

7

at 656 ("First, Plaintiffs cannot satisfy the requirements of standing by adding events that have occurred after the Shell Egg Laws took effect."). But as the Ninth Circuit has explained, the proper way to eliminate any concern along those lines is to allow a supplemental pleading under Rule 15(d), rather than amendment under Rule 15(a). *Northstar Financial Advisors Inc. v. Schwab Investments*, 779 F.3d 1036, 1043-48 (9th Cir. 2015). Allowing a supplemental pleading to correct a defective complaint "circumvents 'the needless formality and expense of instituting a new action when events occurring after the original filing indicated a right to relief.'" *Id.* at 1044 (quoting Wright, Miller, & Kane, Federal Practice and Procedure: Civil 3d § 1505, pgs. 262-63).

This is such a case. The day after the United States filed its complaint, Hawaii filed the State Action. That state court suit raises legal claims that the United States will allege in its supplemental complaint are preempted by federal law. For purposes of standing, this Court must accept the United States' legal premise. *See Federal Election Comm'n v. Cruz*, 596 U.S. 289, 298 (2022) (accepting the merits of plaintiffs' legal claims for standing purposes). And the United States is prepared to demonstrate not only that Hawaii's prosecution of preempted state law claims against the defendant energy producers effects an injury to federal sovereignty, Comp. ¶ 7, but also that it conflicts with the United States' administration of the

8

Clean Air Act, Szabo Decl. ¶¶ 17-27, and the exercise of its foreign affairs powers, Landau Decl. ¶¶ 16-23.

In sum, granting the United States leave to file a supplemental complaint would be an efficient path forward and would give the United States a fair chance to respond to the Court's dismissal decision.

## II.  The Court alternatively should correct a manifest error by altering the final judgment to be a dismissal *without* prejudice.

If the Court declines to allow filing a supplemental complaint, the Court should, at a minimum, alter the final judgment to be a dismissal *without* prejudice. "In general, dismissal for lack of subject matter jurisdiction is without prejudice." *Missouri*, 847 F.3d at 656. A dismissal for lack of subject matter jurisdiction "must be without prejudice, because a lack of jurisdiction deprives the dismissing court of any power to adjudicate the merits of the case." *Hampton v. Pacific Investment Mgmt. Co. LLC*, 869 F.3d 844, 846 (9th Cir. 2017).

This rule applies equally to "dismissals for lack of Article III jurisdiction," which "must be entered without prejudice because a court that lacks jurisdiction is powerless to reach the merits." *Barke*, 25 F.4th at 721 (cleaned up). So when a district court dismisses a complaint for lack of standing *with* prejudice, the Ninth Circuit has remanded to the district court with instructions to dismiss *without* prejudice. *Id.* at 721-22; *see also, e.g.*, *Missouri*, 847 F.3d at 656; *Foothills Christian Ministries v. Johnson*, 148 F.4th 1040, 1050 n.4 (9th Cir. 2025), petition for writ of certiorari filed

9

Jan. 7, 2026 (indicating that the district court, which had dismissed with prejudice a claim due to lack of standing, should on remand amend its judgment to be a dismissal without prejudice).

The final judgment in this case deviated from the Ninth Circuit's rule. Despite the Court's holding that the United States lacked standing to sue Hawaii, the Court dismissed the complaint *with* prejudice. ECF 43 at 30 (order granting judgment on the pleadings); ECF 44 (final judgment).

The Court should correct this manifest error by altering (or amending) the final judgment to be a dismissal *without* prejudice. This will allow the United States to respond to the Court's decision by refiling its lawsuit with more detailed allegations supporting its standing.

## CONCLUSION

The Court should alter or amend the final judgment either (1) to grant leave to file a supplemental complaint, or (2) to dismiss the complaint without prejudice.

10

Respectfully submitted,

ADAM R.F. GUSTAFSON
*Principal Deputy Assistant Attorney General*

/s/ *Justin D. Heminger*
ROBERT N. STANDER
*Deputy Assistant Attorney General*
JUSTIN D. HEMINGER
*Acting Deputy Assistant Attorney General*
Environment and Natural Resources Division
U.S. Department of Justice
950 Pennsylvania Avenue, N.W.
Washington, D.C. 20530
Telephone: (202) 598-5396
Email: justin.heminger@usdoj.gov

May 13, 2026

11

## CERTIFICATE OF COMPLIANCE

This document complies with the word limit of LR 7.4(b) because, excluding the parts of the document exempted by the rule, this document contains 2,259 words, according to the count of Microsoft Word.

/s/ *Justin D. Heminger*
JUSTIN D. HEMINGER

Counsel for the United States

12

# EXHIBIT A

Declaration of EPA Assistant Administrator Aaron Szabo in Support of the United States' Motion for a Preliminary Injunction, Dkt. 13, *United States v. Minnesota*, 26-cv-02456-SRN-DLM (D. Minn. May 11, 2026)

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>*Plaintiff,*<br><br>v.<br><br>STATE OF MINNESOTA and KEITH ELLISON, in his official capacity as Minnesota Attorney General<br><br>*Defendants.* | Civil Action No.<br>26-cv-02456-SRN-DLM<br><br><br>**Declaration of EPA Assistant Administrator Aaron Szabo in Support of the United States' Motion for a Preliminary Injunction** |

## DECLARATION OF AARON SZABO

1. I, AARON SZABO, pursuant to 28 U.S.C. § 1746, declare, under penalty of perjury, that the following statements are true and correct based upon my personal knowledge or upon information provided to me by persons in my official capacity.

2. I am the Assistant Administrator for the United States Environmental Protection Agency ("EPA" or "the Agency") Office of Air and Radiation ("OAR"), which is located at 1200 Pennsylvania Avenue, NW, Washington, D.C. 20460. As the Assistant Administrator for OAR, I serve as the principal advisor to the EPA Administrator on matters pertaining to air and radiation programs and am responsible for managing these programs, including: policy

1

development and evaluation; development of emissions standards; policy guidance and overview; and technical support and evaluation of regional air and radiation program activities.

3.     Prior to joining EPA, I served as a federal civil servant, first at the Nuclear Regulatory Commission, where I worked on nuclear power plant issues and regulations, and then at the White House Office of Information and Regulatory Affairs, where I worked on major climate and air regulations. I continued my career civil service as the Senior Counsel at the Council on Environmental Quality, where my role expanded to include the National Environmental Policy Act and federal sustainability issues. I hold degrees in economics, government and politics from the University of Maryland, College Park, and a law degree from George Washington University Law School.

4.     OAR is the EPA office with primary responsibility for administration of the Clean Air Act ("CAA"). Through my role as Assistant Administrator for OAR, I am familiar with the development and implementation of EPA programs, policies, and regulations under the CAA. As part of my duties, I am the principal official responsible for EPA regulation of stationary sources under Title I of the CAA and for EPA regulation of mobile sources and fuels under Title II of the CAA.

5.     I am familiar with the lawsuit in *Minnesota v. American Petroleum Institute, et al.*, No. 62-cv-20-3837 (Minn. Dist. Ct.), in which Minnesota Attorney General Keith Ellison, on behalf of Minnesota, seeks to ensure that multinational energy producers "bear the costs" of alleged harms attributed to "global warming." *Id.* Compl. ¶ 7.

6.     This declaration is filed in support of the United States' motion for a preliminary injunction in *United States v. Minnesota, et al.*, No. 26-cv-02456-SRN-DLM (D. Minn.). In this declaration, I explain EPA's role in administering the CAA and the ways in which Minnesota's lawsuit—and dozens of other similar lawsuits by States and localities seeking to regulate the oil and gas sector through claims for damages and injunctive relief—impedes EPA's ability to carry out these statutory programs.

## Statutory Background

7.     In enacting and amending the CAA, Congress recognized that interstate air pollution is national in scope and must be addressed at the national level. The CAA's stated purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

8.     To accomplish this purpose, Congress vested EPA with the authority and obligation to administer the CAA's programs for controlling

3

interstate air pollution. EPA has exclusive authority over interstate and international air emission issues, including the promulgation of national regulations and the review and approval of State plans implementing statutory and regulatory requirements, while State and local air agencies may regulate emissions from stationary sources only within their jurisdictions. *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014) (explaining that states may "prohibit in-state sources" of air emissions but "lack authority to control" "out-of-state pollution").

### EPA's Stationary Source Programs

9.   Title I of the CAA regulates stationary source emissions through three main programs administered by EPA. The Agency regulates the oil and gas sector in multiple ways under these programs, which cover, individually and collectively, the production, processing, transmission, and storage of the energy Americans use every day to power their homes and fuel their vehicles.

10.   Under the national ambient air quality standards ("NAAQS") program, EPA develops air quality criteria and national standards for criteria pollutants to protect human health and welfare. *See* 42 U.S.C. §§ 7408-09. These standards are implemented through State implementation plans (SIPs) developed by State and local air agencies, subject to EPA review and approval, or through Federal implementation plans (FIPs) promulgated by

4

EPA. *See id.* § 7410. Among other things, EPA must ensure that SIPs and FIPs include permitting programs for stationary sources that authorize the operation, construction, and/or modification of covered stationary sources subject to certain conditions. *See, e.g., id.* § 7475. EPA must also ensure as an element of these permitting programs that covered stationary sources use the best available control technology ("BACT") to limit emissions of regulated pollutants, including the criteria pollutants within the NAAQS program as well as other types of pollutants. *See, e.g., id.* § 7475(a)(4).

11.   Under section 111, EPA develops new source standards of performance for categories of stationary sources that, "in [its] judgment, caus[e], or contribut[e] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id.* § 7411(b)(1)(A). These standards backstop progress achieved under the NAAQS program in particular areas by setting a national floor for new or modified sources (and, in certain circumstances, by setting emission guidelines for existing sources). *See id.* § 7411(b)(1)(B), (d)(1).

12.   Under section 112, EPA develops national emission standards for hazardous air pollutants for categories of stationary sources that emit certain quantities of hazardous air pollutants ("HAPs"). *See id.* § 7412. Congress specified an initial list of covered HAPs, and the statute both authorizes EPA

5

to add to the list under certain conditions and allows the public to petition for the addition of new HAPs. *See id.* § 7412(b).

## EPA's Mobile Source Programs

13.   Title II of the CAA addresses emissions from mobile sources and fuels. The Agency regulates the oil and gas sector extensively under Title II, including by requiring the registration of gasoline and diesel, ongoing reporting, and the blending of transportation fuel with qualifying renewable fuels to reduce lifecycle greenhouse gas emissions pursuant to the renewable fuel standard ("RFS") program.

14.   Under section 202, EPA promulgates standards for the emission of air pollutants from classes of new motor vehicles and new motor vehicle engines "which in [its] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id.* § 7521(a)(1). In developing standards, EPA must consider, among other things, adequate lead time, the availability of requisite technology, and the cost of compliance. *See, e.g.*, *id.* § 7521(a)(2)-(3).

15.   Under section 211, EPA regulates fuel or fuel additives used in on-road or non-road vehicles and engines. *See id.* § 7545. This provision includes a registration process that requires testing for the public health and environmental effects of the relevant fuel or fuel additive and the disclosure

6

of information pertaining to the nature of the fuel or fuel additive and the impacts of its emissions when used. *See id.* § 7545(a)-(b). EPA typically makes this information available online, and both the statute and implementing regulations specify it is not confidential. *See id.* § 7545(b)(2); 40 C.F.R. § 79.59(e). EPA may control or prohibit the manufacture or sale any fuel or fuel additive that, in the EPA Administrator's judgment, "causes, or contributes, to air pollution or water pollution . . . that may reasonably be anticipated to endanger the public health or welfare" or significantly impair an emission control device or system in general use. 42 U.S.C. § 7545(c)(1).

16.   Under the RFS program, which Congress separately enacted and amended in CAA section 211(o), EPA requires refiners and importers (obligated parties) to blend into gasoline and diesel (transportation fuels) minimum volumes of qualifying renewable fuels that are statutorily defined as, among other things, having lifecycle greenhouse gas emissions at certain percentages below those of transportation fuels. *See id.* § 7545(o). Congress established volumes for initial years and required EPA to set the volumes thereafter based on consideration of statutory factors including the impact of production of renewable fuels on the environment, energy security, anticipated production, infrastructure, cost to consumers, and impacts on the agricultural sector and rural development. *See id.* § 7545(o)(2)(B).

7

### Adverse Effects of Minnesota's Lawsuit on
### EPA's Administration of the Clean Air Act

17.   Minnesota's lawsuit seeks to change the behavior of energy producers in the oil and gas sector on a national and global scale by seeking injunctive and monetary relief that would fundamentally alter the market conditions of the sector and the economy writ large.

18.   As the agency charged with administering the CAA—Congress's principal exercise of its authority to regulate interstate air pollution—EPA is experiencing adverse effects due to the uncertainty caused by Minnesota's lawsuit which negatively impacts EPA's ability to carry out its statutory functions under the CAA. As discussed below, the uncertainty created by the lawsuit's global reach and requested remedy are adversely impacting EPA's ability to (1) provide certainty as the exclusive regulator at the national level; (2) develop standards that accurately reflect relevant statutory factors and purposes; and (3) administer statutory programs for the regulation of mobile sources and associated fuels, including the RFS program.

19.   First, EPA administers CAA programs that presume the lawful production and use of oil and gas by stationary and mobile sources. Under Title I, Title II, and the RFS program, EPA's regulations authorize the production and use of energy provided that these sources comply with applicable requirements. Additionally, although States have the authority under section

8

116 of the CAA to regulate in-state sources more stringently, *see id.* § 7416, Congress vested EPA with the exclusive authority under the RFS program to determine on a nationwide basis whether and how emissions are to be regulated to protect the public health and welfare, *see, e.g., id.* §§ 7411(b)(1)(A), 7521(a)(1), 7545(c). Minnesota's lawsuit seeks to regulate the oil and gas sector in a manner that EPA has not found to be appropriate under these standards. The result is significant uncertainty regarding the regulatory status of energy producers. This uncertainty undermines EPA's exclusive authority under the CAA and its ability to communicate to the public about the safety of this sector and its products and the restrictions required to protect public health and welfare.

20.  For example, EPA's fuel regulations under section 211 authorize energy producers to engage in the transportation fuel market subject to certain requirements. EPA's implementing regulations for section 211 require the registration of fuel and fuel additives, including gasoline and diesel products, *see* 40 C.F.R. pts. 79 & 1090, as well as regular reporting to provide up-to-date information, *see id.* § 79.5. EPA also regulates the sulfur and benzene content of gasoline and diesel and requires regular reporting on these fuel products to ensure compliance. *See id.* pt. 1090. And EPA's RFS regulations specifically address the lifecycle greenhouse gas emissions of transportation

9

fuel by requiring obligated parties to blend gasoline and diesel with qualifying renewable fuels (*e.g.*, ethanol), and EPA must consider lifecycle greenhouse gas emissions to determine whether fuels qualify as a renewable fuel. Reporting and compliance information under these regulations is generally publicly available, *see id.* §§ 80.1402, 1090.15.

21. Minnesota's lawsuit interferes with these EPA programs by undermining the reliance interests in EPA's regulatory scheme and the Agency's ability to administer comprehensive compliance programs.

22. Second, EPA must balance competing factors and values when developing emission standards and requirements under Title I and Title II. Minnesota's lawsuit—and similar lawsuits brought by dozens of other States and localities—undermine the accuracy of EPA's prior assessments of market conditions and frustrate EPA's ability to accurately predict market conditions for standards, requirements, and regulations that are intended to provide market and regulatory certainty for years into the future.

23. For example, section 111 requires EPA to consider the cost and feasibility of potential systems of emission control when promulgating and revising new source standards of performance and emission guidelines. *See id.* § 7411(a)(1). EPA also considers cost and feasibility when promulgating and revising national emission standards for hazardous air pollutants under

10

section 112. *See id.* § 7412(d)(2), (d)(6). And EPA's Title II programs require EPA to consider lead time, compliance cost, and the availability of requisite technology when regulating manufacturers of new motor vehicles and engines.

24.    By threatening potentially hundreds of millions (or even billions) of dollars in additional liability for the oil and gas sector, a regulated source category under sections 111 and 112, Minnesota's lawsuit interferes with EPA's ability to assess the sector's capacity to bear the costs of additional controls and whether additional controls are feasible or appropriate.[1] Likewise, the uncertainty and disruption caused by Minnesota's lawsuit interfere with EPA's ability to evaluate the future market for vehicles and engines that combust that fuel.

25.    Finally, Minnesota's lawsuit conflicts with EPA's administration of the RFS program, which, among other things, addresses the lifecycle greenhouse gas emission potential of transportation fuels by requiring minimum volumes of qualifying renewable fuels.

---

[1] Although Minnesota's lawsuit does not detail the damages it seeks, the additional liability it would impose on energy producers would materially interfere with EPA's ability to assess costs and other market conditions it is required to consider.

11

26.    In setting volumes, evaluating exemption petitions, and managing implementation and compliance, EPA analyzes the complex economic conditions of the transportation fuel market, the costs of applicable volumes, and the impacts on consumers and other economic sectors. *See id.* § 7545(o)(2)(B)(ii). Obligated parties comply by either blending their share of qualifying renewable fuels into transportation fuels or purchasing sufficient credits to cover their obligation for the relevant period. *See* 40 C.F.R. §§ 80.1406, 80.1427; 91 Fed. Reg. 16388 (Apr. 1, 2026) (final rule setting RFS volume obligations for 2026-2027). Predictability and certainty are essential to these analyses and the successful operation of the program because farmers, refiners, and other regulated parties expend significant resources over several years as a result of the program. *See, e.g.*, *id* at 16419 (describing how EPA estimated the recent RFS rule's impacts on job creation and rural economic development, as required by the CAA).

27.    Minnesota's lawsuit interferes with EPA's statutory responsibility to administer the program in a reasonable and predictable manner by upsetting market conditions, threatening a significant shift in available resources, and undermining EPA's decisions regarding the appropriate balance of consumer costs, availability, rural economic development, and the lifecycle greenhouse gas emissions of various types of fuel.

12

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 11, 2026, in Washington, D.C.

_____
Aaron Szabo
Assistant Administrator,
Office of Air and Radiation
U.S. Environmental Protection Agency

13

# EXHIBIT B

Declaration of Christopher Landau, Deputy Secretary of State of the United States of America, Dkt. 12, *United States v. Minnesota*, 26-cv-02456-SRN-DLM (D. Minn. May 11, 2026)

CASE 0:26-cv-02456-SRN-DLM   Doc. 12   Filed 05/11/26   Page 1 of 7
Case 1:25-cv-00179-HG-WRP   Document 45   Filed 05/13/26   Page 31 of 37   PageID.631
*U.S. v. Minnesota* (D. Minn.) - State Department Declaration

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

UNITED STATES OF AMERICA

　　　　　　　　　　　　　*Plaintiff,*

　　　　v.

STATE OF MINNESOTA, *et al.,*

　　　　　　　　　　　　　*Defendants,*

## DECLARATION OF CHRISTOPHER LANDAU
## DEPUTY SECRETARY OF STATE OF THE UNITED STATES OF AMERICA

I, Christopher Landau, declare as follows:

1.　　　　I am the Deputy Secretary of State of the United States of America. In that capacity, I am the principal deputy, adviser, and alter ego to the Secretary of State, the President's chief foreign affairs advisor. I serve as Acting Secretary of State in the Secretary's absence, and I assist the Secretary in the formulation and conduct of U.S. foreign policy and in giving direction to all elements of the Department of State. I carry out the President's foreign policy through the State Department and the Foreign Service of the United States. *See* 22 U.S.C. § 2651a. I have served in this role since March 25, 2025, and previously served as United States Ambassador to Mexico, among other positions.

2.　　　　I am familiar with the lawsuit in *Minnesota v. American Petroleum Institute, et al.,* No. 62-CV-20-3837 (Minn. Dist. Ct.), in which Minnesota seeks to ensure that multinational energy producers "bear the costs" of alleged "global warming." *Id.* Complaint ¶ 7.

*U.S. v. Minnesota* (D. Minn.) - State Department Declaration

## A.    Background

3.    The Department of State leads the development of the United States' foreign policy and engages in diplomacy on behalf of the United States.

4.    In 1987, Congress enacted the Global Climate Protection Act. *See* Pub. L. No. 100-204, Title XI, §§ 1101–1106, 101 Stat. 1331, 1407–09 (1987), reprinted as note to 15 U.S.C. § 2901. The Global Climate Protection Act provides that the United States should "work toward multilateral agreements" on the issue of greenhouse gas emissions. *Id.* § 1103(a)(4), 101 Stat. at 1408. It assigns the President and EPA responsibility for devising a "coordinated national policy on global climate change." *Id.* § 1103(b), 101 Stat. at 1408. It also tasks the President and the Secretary of State with coordinating climate change policy in the international arena. *Id.* § 1103(c), 101 Stat. at 1409.

5.    The United States became a party to the United Nations Framework Convention on Climate Change of 1992 (the "Framework Convention") on October 15, 1992. *See* https://unfccc.int/resource/docs/convkp/conveng.pdf (last visited May 28, 2025). The Framework Convention was ratified by the President with the advice and consent of the Senate. *See* Senate Daily Digest Regarding Treaty Doc. 102-38: "United Nations Framework Convention on Climate Change."

6.    The United States is not a party to the Kyoto Protocol of 1997, which imposes upon parties legally binding greenhouse gas emissions limitations and reduction targets that are listed in Framework Convention Annex I (a list that includes the United States). Although the United States signed the Kyoto Protocol, President Clinton never submitted it to the Senate for advice and consent. Instead, the Senate passed a unanimous resolution expressing disapproval of any protocol or other agreement that provides for disparate treatment of parties based on their

CASE 0:26-cv-02456-SRN-DLM Doc. 12 Filed 05/11/26 Page 3 of 7
Case 1:25-cv-00179-HG-WRP Document 45 Filed 05/13/26 Page 33 of 37 PageID.633
*U.S. v. Minnesota* (D. Minn.) - State Department Declaration

development status for the imposition of new commitments to limit or reduce greenhouse gas emissions. S. Res. 98, 105th Cong. (1997).

7. In April 2016, Secretary of State John Kerry signed the Paris Agreement, http://unfccc.int/files/essential_background/convention/application/pdf/english_paris_agreement. pdf (last visited May 28, 2025). The Paris Agreement calls for significant reductions in greenhouse gas emissions. As an executive agreement, the Paris Agreement was not submitted to the Senate for advice and consent.

8. On March 28, 2017, President Trump described how the United States would seek to reconcile the Nation's environmental, economic, and strategic concerns. *See* Exec. Order 13,783, 82 Fed. Reg. 16,093 (Mar. 28, 2017). On June 1, 2017, he announced the U.S. intent to withdraw from the Paris Agreement.

9. On November 4, 2019, the United States deposited a notification of withdrawal from the Paris Agreement. Press Release, U.S. Dept. of State, *On the U.S. Withdrawal from the Paris Agreement* (Nov. 4, 2019).

10. On February 19, 2021, President Biden announced that the United States had rejoined the Paris Agreement. Press Release, U.S. Dept. of State, *The United States Officially Rejoins the Paris Agreement* (Feb. 19, 2021).

**B.** **Current U.S. Foreign Policy**

11. President Trump has taken multiple actions that make clear the U.S. foreign policy with respect to energy and climate change. On January 20, 2025, President Trump directed the U.S. Ambassador to the United Nations to submit notification of the United States' withdrawal from the Paris Agreement. *See* Putting America First in International Agreements,

CASE 0:26-cv-02456-SRN-DLM   Doc. 12   Filed 05/11/26   Page 4 of 7
Case 1:25-cv-00179-HG-WRP   Document 45   Filed 05/13/26   Page 34 of 37   PageID.634
*U.S. v. Minnesota* (D. Minn.) - State Department Declaration

Executive Order 14162, § 3(a), 90 Fed. Reg. 8455, 8455 (Jan. 20, 2025). U.S. withdrawal from the Paris Agreement took effect on January 27, 2026.

12. On February 27, 2026, pursuant to the President's Memorandum of January 7, 2026, the United States notified the U.N. Secretary General, which serves as the depositary for the Framework Convention, of its intent to withdraw. *See* Presidential Memorandum, "Withdrawing the United States from International Organizations, Conventions, and Treaties that Are Contrary to the Interests of the United States," § 2(b)(xxii) (January 7, 2026) (https://www.whitehouse.gov/presidential-actions/2026/01/withdrawing-the-united-states-from-international-organizations-conventions-and-treaties-that-are-contrary-to-the-interests-of-the-united-states/). That withdrawal will take effect on February 27, 2027.

13. Also on January 20, 2025, President Trump declared a national energy emergency pursuant to the National Emergencies Act, 50 U.S.C. 1601 *et seq.*, on the basis that insufficient energy production is a threat to national security and economic prosperity. *See* Declaring a National Energy Emergency, Exec. Order 14156, § 1, 90 Fed. Reg. 8,433, 8,434 (Jan. 20, 2025). The President further identified an "active threat to the American people from high energy prices" and determined that "[a]n affordable and reliable domestic supply of energy is a fundamental requirement for the national and economic security of any nation." *Id.*

14. President Trump has determined that "[i]t shall be the policy of my Administration to make America energy dominant," and in furtherance of this policy, the United States "must expand all forms of reliable and affordable energy production," including fossil fuels. Establishing the National Energy Dominance Council, Executive Order 14213, § 1, 90 Fed. Reg. 9,945 (Feb. 14, 2025). He established the National Energy Dominance Council, which includes the Secretary of State, to provide the President with recommendations for increasing

*U.S. v. Minnesota* (D. Minn.) - State Department Declaration

energy production, including through elimination of unnecessary regulation and promoting awareness of "the national security concerns with removing reliable and affordable energy sources." *Id.* §§ 3-4.

15. President Trump has also identified problematic overreach by states seeking to enact "burdensome and ideologically motivated 'climate change' or energy policies that threaten American energy dominance and our economic and national security" and aim to "dictate interstate and international disputes over air, water, and natural resources." Protecting American Energy from State Overreach, Exec. Order 14260, § 1, 90 Fed. Reg. 15513, 15513 (April 8, 2025).

16. Minnesota's lawsuit against multinational energy producers, which seeks a global remedy for a global issue involving atmospheric greenhouse gas emissions, directly conflicts with current U.S. foreign policy in multiple respects.

17. Minnesota's lawsuit increases costs for energy producers with ties to Minnesota, which could in turn increase energy costs for U.S. consumers, thereby undermining crucial U.S. policy and national security interests in increasing affordable domestic energy.

18. The lawsuit also undermines important diplomatic efforts to advance U.S. interests. For example, in international climate-change negotiations, the United States has long opposed the establishment of liability and compensation schemes at the international level for alleged climate change. Minnesota's lawsuit, alongside other burdensome suits or regulations from States, interferes with this longstanding position by effectively seeking to impose just such a program and therefore creates new frictions in all international negotiations that implicate climate policies by targeting fossil fuel companies for actions they took overseas.

*U.S. v. Minnesota* (D. Minn.) - State Department Declaration

19.    Minnesota's lawsuit further interferes with the United States' foreign policy on greenhouse gas regulation, as reflected in the U.S. withdrawal from the Paris Agreement and its notice of withdrawal from the Framework Convention, both of which are international agreements that do not reflect U.S. values or contributions to managing economic and environmental objectives.

20.    Minnesota's lawsuit, by imposing costs on energy producers for global greenhouse gas emissions, harms foreign relations between the United States and foreign countries where such producers are based or have substantial operations.

21.    Because foreign fossil fuel producers that have a connection with Minnesota will likely be affected by this lawsuit, their home countries may seek to respond to the lawsuit through their relations with the United States, including expressing their concerns through diplomatic engagements, retaliating through increased costs on U.S. fossil fuel producers operating in those countries, or by taking other steps against U.S. interests. These types of actions impair the Executive Branch's ability to achieve the President's foreign policy goals, especially related to energy.

22.    Minnesota's lawsuit also harms the federal government's capacity to speak with one voice when conducting commercial and political relations with foreign governments on issues such as climate change, regulation of greenhouse gas emissions, energy production, and related national security issues. It hampers what President Trump has lauded as the ability of the United States to "grow its economy and maintain jobs for its citizens while playing a leadership role in global efforts to protect the environment." Exec. Order 14162, § 1, 90 Fed. Reg. at 8455.

*U.S. v. Minnesota* (D. Minn.) - State Department Declaration

23.     These foreign policy harms multiply as other States start or continue their own climate change lawsuits, because it would become even more difficult—if not impossible—to maintain a coherent national position on the regulation of global greenhouse gas emissions.

I declare under penalty of perjury that the foregoing is true and correct.

_____
Christopher Landau

Executed this ___4th___ day of May 2026, Washington, D.C.