# EXHIBIT A

Declaration of EPA Assistant Administrator Aaron Szabo in Support of the United States' Motion for a Preliminary Injunction, Dkt. 13, *United States v. Minnesota*, 26-cv-02456-SRN-DLM (D. Minn. May 11, 2026)

CASE 0:26-cv-02456-SRN-DLM    Doc. 13    Filed 05/11/26    Page 1 of 13
Case 1:25-cv-00179-HG-WRP    Document 46-1    Filed 05/13/26    Page 2 of 14
PageID.654

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF MINNESOTA

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>   *Plaintiff,*<br><br>  v.<br><br>STATE OF MINNESOTA and KEITH ELLISON, in his official capacity as Minnesota Attorney General<br><br>   *Defendants.* | Civil Action No.<br>26-cv-02456-SRN-DLM<br><br><br>**Declaration of EPA Assistant Administrator Aaron Szabo in Support of the United States' Motion for a Preliminary Injunction** |

### DECLARATION OF AARON SZABO

1. I, AARON SZABO, pursuant to 28 U.S.C. § 1746, declare, under penalty of perjury, that the following statements are true and correct based upon my personal knowledge or upon information provided to me by persons in my official capacity.

2. I am the Assistant Administrator for the United States Environmental Protection Agency ("EPA" or "the Agency") Office of Air and Radiation ("OAR"), which is located at 1200 Pennsylvania Avenue, NW, Washington, D.C. 20460. As the Assistant Administrator for OAR, I serve as the principal advisor to the EPA Administrator on matters pertaining to air and radiation programs and am responsible for managing these programs, including: policy

1

CASE 0:26-cv-02456-SRN-DLM    Doc. 13    Filed 05/11/26    Page 2 of 13
Case 1:25-cv-00179-HG-WRP    Document 46-1    Filed 05/13/26    Page 3 of 14
PageID.655

development and evaluation; development of emissions standards; policy guidance and overview; and technical support and evaluation of regional air and radiation program activities.

3.    Prior to joining EPA, I served as a federal civil servant, first at the Nuclear Regulatory Commission, where I worked on nuclear power plant issues and regulations, and then at the White House Office of Information and Regulatory Affairs, where I worked on major climate and air regulations. I continued my career civil service as the Senior Counsel at the Council on Environmental Quality, where my role expanded to include the National Environmental Policy Act and federal sustainability issues. I hold degrees in economics, government and politics from the University of Maryland, College Park, and a law degree from George Washington University Law School.

4.    OAR is the EPA office with primary responsibility for administration of the Clean Air Act ("CAA"). Through my role as Assistant Administrator for OAR, I am familiar with the development and implementation of EPA programs, policies, and regulations under the CAA. As part of my duties, I am the principal official responsible for EPA regulation of stationary sources under Title I of the CAA and for EPA regulation of mobile sources and fuels under Title II of the CAA.

2

CASE 0:26-cv-02456-SRN-DLM    Doc. 13    Filed 05/11/26    Page 3 of 13
Case 1:25-cv-00179-HG-WRP    Document 46-1    Filed 05/13/26    Page 4 of 14
PageID.656

5. I am familiar with the lawsuit in *Minnesota v. American Petroleum Institute, et al.*, No. 62-cv-20-3837 (Minn. Dist. Ct.), in which Minnesota Attorney General Keith Ellison, on behalf of Minnesota, seeks to ensure that multinational energy producers "bear the costs" of alleged harms attributed to "global warming." *Id.* Compl. ¶ 7.

6. This declaration is filed in support of the United States' motion for a preliminary injunction in *United States v. Minnesota, et al.*, No. 26-cv-02456-SRN-DLM (D. Minn.). In this declaration, I explain EPA's role in administering the CAA and the ways in which Minnesota's lawsuit—and dozens of other similar lawsuits by States and localities seeking to regulate the oil and gas sector through claims for damages and injunctive relief—impedes EPA's ability to carry out these statutory programs.

## Statutory Background

7. In enacting and amending the CAA, Congress recognized that interstate air pollution is national in scope and must be addressed at the national level. The CAA's stated purpose is "to protect and enhance the quality of the Nation's air resources so as to promote the public health and welfare and the productive capacity of its population." 42 U.S.C. § 7401(b)(1).

8. To accomplish this purpose, Congress vested EPA with the authority and obligation to administer the CAA's programs for controlling

CASE 0:26-cv-02456-SRN-DLM  Doc. 13  Filed 05/11/26  Page 4 of 13
Case 1:25-cv-00179-HG-WRP  Document 46-1  Filed 05/13/26  Page 5 of 14
PageID.657

interstate air pollution. EPA has exclusive authority over interstate and international air emission issues, including the promulgation of national regulations and the review and approval of State plans implementing statutory and regulatory requirements, while State and local air agencies may regulate emissions from stationary sources only within their jurisdictions. *See EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 495 (2014) (explaining that states may "prohibit in-state sources" of air emissions but "lack authority to control" "out-of-state pollution").

### EPA's Stationary Source Programs

9. Title I of the CAA regulates stationary source emissions through three main programs administered by EPA. The Agency regulates the oil and gas sector in multiple ways under these programs, which cover, individually and collectively, the production, processing, transmission, and storage of the energy Americans use every day to power their homes and fuel their vehicles.

10. Under the national ambient air quality standards ("NAAQS") program, EPA develops air quality criteria and national standards for criteria pollutants to protect human health and welfare. *See* 42 U.S.C. §§ 7408-09. These standards are implemented through State implementation plans (SIPs) developed by State and local air agencies, subject to EPA review and approval, or through Federal implementation plans (FIPs) promulgated by

4

CASE 0:26-cv-02456-SRN-DLM    Doc. 13    FILED 05/11/26    Page 5 of 13
Case 1:25-cv-00179-HG-WRP    Document 46-1    Filed 05/13/26    Page 6 of 14
PageID.658

EPA. *See id.* § 7410. Among other things, EPA must ensure that SIPs and FIPs include permitting programs for stationary sources that authorize the operation, construction, and/or modification of covered stationary sources subject to certain conditions. *See, e.g., id.* § 7475. EPA must also ensure as an element of these permitting programs that covered stationary sources use the best available control technology ("BACT") to limit emissions of regulated pollutants, including the criteria pollutants within the NAAQS program as well as other types of pollutants. *See, e.g., id.* § 7475(a)(4).

11.    Under section 111, EPA develops new source standards of performance for categories of stationary sources that, "in [its] judgment, caus[e], or contribut[e] significantly to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id.* § 7411(b)(1)(A). These standards backstop progress achieved under the NAAQS program in particular areas by setting a national floor for new or modified sources (and, in certain circumstances, by setting emission guidelines for existing sources). *See id.* § 7411(b)(1)(B), (d)(1).

12.    Under section 112, EPA develops national emission standards for hazardous air pollutants for categories of stationary sources that emit certain quantities of hazardous air pollutants ("HAPs"). *See id.* § 7412. Congress specified an initial list of covered HAPs, and the statute both authorizes EPA

5

CASE 0:26-cv-02456-SRN-DLM   Doc. 13   Filed 05/11/26   Page 6 of 13
Case 1:25-cv-00179-HG-WRP   Document 46-1   Filed 05/13/26   Page 7 of 14
PageID.659

to add to the list under certain conditions and allows the public to petition for the addition of new HAPs. *See id.* § 7412(b).

### EPA's Mobile Source Programs

13. Title II of the CAA addresses emissions from mobile sources and fuels. The Agency regulates the oil and gas sector extensively under Title II, including by requiring the registration of gasoline and diesel, ongoing reporting, and the blending of transportation fuel with qualifying renewable fuels to reduce lifecycle greenhouse gas emissions pursuant to the renewable fuel standard ("RFS") program.

14. Under section 202, EPA promulgates standards for the emission of air pollutants from classes of new motor vehicles and new motor vehicle engines "which in [its] judgment cause, or contribute to, air pollution which may reasonably be anticipated to endanger public health or welfare." *Id.* § 7521(a)(1). In developing standards, EPA must consider, among other things, adequate lead time, the availability of requisite technology, and the cost of compliance. *See, e.g.*, *id.* § 7521(a)(2)-(3).

15. Under section 211, EPA regulates fuel or fuel additives used in on-road or non-road vehicles and engines. *See id.* § 7545. This provision includes a registration process that requires testing for the public health and environmental effects of the relevant fuel or fuel additive and the disclosure

6

CASE 0:26-cv-02456-SRN-DLM    Doc. 13    Filed 05/11/26    Page 7 of 13
Case 1:25-cv-00179-HG-WRP    Document 46-1    Filed 05/13/26    Page 8 of 14
PageID.660

of information pertaining to the nature of the fuel or fuel additive and the impacts of its emissions when used. *See id.* § 7545(a)-(b). EPA typically makes this information available online, and both the statute and implementing regulations specify it is not confidential. *See id.* § 7545(b)(2); 40 C.F.R. § 79.59(e). EPA may control or prohibit the manufacture or sale any fuel or fuel additive that, in the EPA Administrator's judgment, "causes, or contributes, to air pollution or water pollution . . . that may reasonably be anticipated to endanger the public health or welfare" or significantly impair an emission control device or system in general use. 42 U.S.C. § 7545(c)(1).

16.    Under the RFS program, which Congress separately enacted and amended in CAA section 211(o), EPA requires refiners and importers (obligated parties) to blend into gasoline and diesel (transportation fuels) minimum volumes of qualifying renewable fuels that are statutorily defined as, among other things, having lifecycle greenhouse gas emissions at certain percentages below those of transportation fuels. *See id.* § 7545(o). Congress established volumes for initial years and required EPA to set the volumes thereafter based on consideration of statutory factors including the impact of production of renewable fuels on the environment, energy security, anticipated production, infrastructure, cost to consumers, and impacts on the agricultural sector and rural development. *See id.* § 7545(o)(2)(B).

CASE 0:26-cv-02456-SRN-DLM    Doc. 13    Filed 05/11/26    Page 8 of 13
Case 1:25-cv-00179-HG-WRP    Document 46-1    Filed 05/13/26    Page 9 of 14
PageID.661

**Adverse Effects of Minnesota's Lawsuit on**
**EPA's Administration of the Clean Air Act**

17.   Minnesota's lawsuit seeks to change the behavior of energy producers in the oil and gas sector on a national and global scale by seeking injunctive and monetary relief that would fundamentally alter the market conditions of the sector and the economy writ large.

18.   As the agency charged with administering the CAA—Congress's principal exercise of its authority to regulate interstate air pollution—EPA is experiencing adverse effects due to the uncertainty caused by Minnesota's lawsuit which negatively impacts EPA's ability to carry out its statutory functions under the CAA. As discussed below, the uncertainty created by the lawsuit's global reach and requested remedy are adversely impacting EPA's ability to (1) provide certainty as the exclusive regulator at the national level; (2) develop standards that accurately reflect relevant statutory factors and purposes; and (3) administer statutory programs for the regulation of mobile sources and associated fuels, including the RFS program.

19.   First, EPA administers CAA programs that presume the lawful production and use of oil and gas by stationary and mobile sources. Under Title I, Title II, and the RFS program, EPA's regulations authorize the production and use of energy provided that these sources comply with applicable requirements. Additionally, although States have the authority under section

8

CASE 0:26-cv-02456-SRN-DLM    Doc. 13    Filed 05/11/26    Page 9 of 13
Case 1:25-cv-00179-HG-WRP    Document 46-1    Filed 05/13/26    Page 10 of 14
PageID.662

116 of the CAA to regulate in-state sources more stringently, *see id.* § 7416, Congress vested EPA with the exclusive authority under the RFS program to determine on a nationwide basis whether and how emissions are to be regulated to protect the public health and welfare, *see, e.g., id.* §§ 7411(b)(1)(A), 7521(a)(1), 7545(c). Minnesota's lawsuit seeks to regulate the oil and gas sector in a manner that EPA has not found to be appropriate under these standards. The result is significant uncertainty regarding the regulatory status of energy producers. This uncertainty undermines EPA's exclusive authority under the CAA and its ability to communicate to the public about the safety of this sector and its products and the restrictions required to protect public health and welfare.

20.    For example, EPA's fuel regulations under section 211 authorize energy producers to engage in the transportation fuel market subject to certain requirements. EPA's implementing regulations for section 211 require the registration of fuel and fuel additives, including gasoline and diesel products, *see* 40 C.F.R. pts. 79 & 1090, as well as regular reporting to provide up-to-date information, *see id.* § 79.5. EPA also regulates the sulfur and benzene content of gasoline and diesel and requires regular reporting on these fuel products to ensure compliance. *See id.* pt. 1090. And EPA's RFS regulations specifically address the lifecycle greenhouse gas emissions of transportation

9

CASE 0:26-cv-02456-SRN-DLM    Doc. 13    Filed 05/11/26    Page 10 of 13
Case 1:25-cv-00179-HG-WRP    Document 46-1    Filed 05/13/26    Page 11 of 14
PageID.663

fuel by requiring obligated parties to blend gasoline and diesel with qualifying renewable fuels (*e.g.*, ethanol), and EPA must consider lifecycle greenhouse gas emissions to determine whether fuels qualify as a renewable fuel. Reporting and compliance information under these regulations is generally publicly available, *see id.* §§ 80.1402, 1090.15.

21.   Minnesota's lawsuit interferes with these EPA programs by undermining the reliance interests in EPA's regulatory scheme and the Agency's ability to administer comprehensive compliance programs.

22.   Second, EPA must balance competing factors and values when developing emission standards and requirements under Title I and Title II. Minnesota's lawsuit—and similar lawsuits brought by dozens of other States and localities—undermine the accuracy of EPA's prior assessments of market conditions and frustrate EPA's ability to accurately predict market conditions for standards, requirements, and regulations that are intended to provide market and regulatory certainty for years into the future.

23.   For example, section 111 requires EPA to consider the cost and feasibility of potential systems of emission control when promulgating and revising new source standards of performance and emission guidelines. *See id.* § 7411(a)(1). EPA also considers cost and feasibility when promulgating and revising national emission standards for hazardous air pollutants under

CASE 0:26-cv-02456-SRN-DLM    Doc. 13    Filed 05/11/26    Page 11 of 13
Case 1:25-cv-00179-HG-WRP    Document 46-1    Filed 05/13/26    Page 12 of 14
PageID.664

section 112. *See id.* § 7412(d)(2), (d)(6). And EPA's Title II programs require EPA to consider lead time, compliance cost, and the availability of requisite technology when regulating manufacturers of new motor vehicles and engines.

24.    By threatening potentially hundreds of millions (or even billions) of dollars in additional liability for the oil and gas sector, a regulated source category under sections 111 and 112, Minnesota's lawsuit interferes with EPA's ability to assess the sector's capacity to bear the costs of additional controls and whether additional controls are feasible or appropriate.[1] Likewise, the uncertainty and disruption caused by Minnesota's lawsuit interfere with EPA's ability to evaluate the future market for vehicles and engines that combust that fuel.

25.    Finally, Minnesota's lawsuit conflicts with EPA's administration of the RFS program, which, among other things, addresses the lifecycle greenhouse gas emission potential of transportation fuels by requiring minimum volumes of qualifying renewable fuels.

---

[1] Although Minnesota's lawsuit does not detail the damages it seeks, the additional liability it would impose on energy producers would materially interfere with EPA's ability to assess costs and other market conditions it is required to consider.

11

CASE 0:26-cv-02456-SRN-DLM    Doc. 13    Filed 05/11/26    Page 12 of 13
Case 1:25-cv-00179-HG-WRP    Document 46-1    Filed 05/13/26    Page 13 of 14
PageID.665

26.    In setting volumes, evaluating exemption petitions, and managing implementation and compliance, EPA analyzes the complex economic conditions of the transportation fuel market, the costs of applicable volumes, and the impacts on consumers and other economic sectors. *See id.* § 7545(o)(2)(B)(ii). Obligated parties comply by either blending their share of qualifying renewable fuels into transportation fuels or purchasing sufficient credits to cover their obligation for the relevant period. *See* 40 C.F.R. §§ 80.1406, 80.1427; 91 Fed. Reg. 16388 (Apr. 1, 2026) (final rule setting RFS volume obligations for 2026-2027). Predictability and certainty are essential to these analyses and the successful operation of the program because farmers, refiners, and other regulated parties expend significant resources over several years as a result of the program. *See, e.g.*, *id* at 16419 (describing how EPA estimated the recent RFS rule's impacts on job creation and rural economic development, as required by the CAA).

27.    Minnesota's lawsuit interferes with EPA's statutory responsibility to administer the program in a reasonable and predictable manner by upsetting market conditions, threatening a significant shift in available resources, and undermining EPA's decisions regarding the appropriate balance of consumer costs, availability, rural economic development, and the lifecycle greenhouse gas emissions of various types of fuel.

12

CASE 0:26-cv-02456-SRN-DLM   Doc. 13   Filed 05/11/26   Page 13 of 13
Case 1:25-cv-00179-HG-WRP   Document 46-1   Filed 05/13/26   Page 14 of 14
PageID.666

I declare under penalty of perjury that the foregoing is true and correct.

Executed on May 11, 2026, in Washington, D.C.

_____
       Aaron Szabo
       Assistant Administrator,
       Office of Air and Radiation
       U.S. Environmental Protection Agency